## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THREE LOWER COUNTIES COMMUNITY HEALTH SERVICES, INC.<br>12137 Elm Street<br>Princess Anne, Maryland 21853, on behalf of itself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>and<br><br>MICHAEL LEAVITT, SECRETARY<br>U.S. Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201, in his official capacity<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Case No. |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.    In this action, plaintiff, Three Lower Counties Community Services, Inc. ("TLC"),

seeks to enjoin the U.S. Department of Health and Human Services and its Secretary

(collectively, "HHS") from applying two cost limits used by HHS in making cost

reimbursements under the Medicare program to Federally-qualified health centers ("FQHCs").

These FQHC cost limits -- a per visit payment "cap" and a physician productivity "screen" -- are

arbitrary, capricious, and contrary to law, and cause harm to all FQHCs participating in the

Medicare program, as well as the patients and communities those FQHCs serve.  This action is

1

brought by TLC both on its own and on behalf of FQHCs that, like TLC, also receive grant funding under Section 330 of the Public Health Service Act -- funding that qualifies these grantees for Medicare FQHC status.

### JURISDICTION AND VENUE AND RELATED AUTHORITY

2.    This action arises under sections 1833(a) and 1861(v)(1)(A) of Title XVIII of the Social Security Act, 42 U.S.C. § 1395l and 1395x *et seq.* (hereinafter the Medicare "Act" or "statute"), Section 330 of the Public Health Service Act, 42 U.S.C. §254b, and provisions of the U.S. Constitution defining the powers of the Legislative and Executive Branches.

3.    The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  Venue is proper in this District under 28 U.S.C. § 1391 (b) and (e).  The declaratory and injunctive and other relief sought in this action is authorized under 28 U.S.C. §§ 2201 and 2202. Related equitable relief is sought pursuant to 28 U.S.C. § 1651.  This action is brought under 5 U.S.C. §702.

4.    Before bringing this action, TLC sought administrative review of the issues raised herein, first, from the Medicare fiscal intermediary and then from the HHS Medicare Provider Reimbursement Review Board.  Three Lower Counties was informed by letter dated April 20, 20007 that the Board "lack[ed] jurisdiction over the appeal."  In that same letter, the Board also stated that "[r]eview of [its] determination" [was] available under the provisions of 42 U.S.C. § 1395oo(f) and "implementing HHS regulations."  Although TLC does not challenge the Board's basic determination that it lacks jurisdiction, other issues regarding the determination may conceivably become issues herein.  Accordingly, review is sought under § 1395oo(f).

## THE PARTIES

### Plaintiff and Class

5.      TLC is a tax-exempt (IRC §501(c)(3)) Maryland nonprofit corporation located in Princess Anne, Maryland.  It is a "health center" in that it currently receives grant funding under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C. § 254b.  Any such grantee (other than one receiving funding under subsection (h) of Section 330) is treated under the Medicare (and Medicaid) statutes as a Federally-qualified health center ("FQHC") and is entitled to enforce the rights those statutes confer on those FQHCs as well as the Medicare program beneficiaries within each FQHC's Section 330 grant community (or communities).  TLC's and the other Section 330 grantees on whose behalf this action is brought so qualify as FQHCs.  Their mission under their PHS Act grants is to provide primary health care and related services to all members of the community or communities in which their services are to be made available.

6.      This action meets the prerequisites of a class action under Fed. R. Civ. P. 23 in the following respects.  First, the class as defined above (all Medicare FQHCs receiving Section 330 grants) is so numerous that joinder of all members is impracticable consistent with Fed. R. Civ. P. 23(a)(1).  Plaintiff reasonably believe that the number of FQHCs in the United States exceeds 1,000.  The number of Medicare FQHCs receiving Section 330 grants is unknown at this time, but plaintiff reasonably believes that the number of such Medicare FQHCs is 900 or more and in any event great enough such that joinder is impracticable.  The disposition of the claims of these Class members in a single class action will provide substantial benefits to all parties and to the Court.

7.      Second, there are questions of law and fact raised herein that are common to the

3

class.

8.      Third, TLC as the named plaintiff will fairly and adequately protect the interests

of the class.

9.      Finally, TLC's claims and the harms it has suffered (and continue to suffer) are

typical of the claims of and injuries to all Medicare FQHCs receiving funding under Section 330

of the PHS Act.

**Defendants**

10.      Defendant Department of Health and Human Services ("HHS") administers the

PHS Act grant and Medicare programs with which this action is concerned.  The PHS Act

program is assigned to HHS' Health Services and Resources Administration ("HRSA"), which

has re-delegated certain authority over that program to its Bureau of Primary Health Care

("BPHC").  The Medicare program has been assigned to the Centers for Medicare and Medicaid

Services, designated by HHS as "CMS"; previously the Health Care Financing Administration

("HCFA").  For purposes of simplicity, all references herein to CMS also apply to HCFA.

11.      Defendant Michael Leavitt is the Secretary of HHS and, as such, is ultimately

responsible for the Medicare and Public Health Service Act programs that are the subject of this

action.  He is sued in his official capacity.

**COMMUNITY HEALTH CENTERS/**
**FEDERALLY-QUALIFIED HEALTH CENTERS**

**Section 330 PHS Act Grant Program**

**A.      General Requirements**

12.      TLC's grantee status (and the status of other PHS Act grantees represented

herein) under Section 330 of the PHS Act derives from a determination by HHS that it meets the

requirements for Section 330 funding; specifically that it is (1) located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) community-based (a majority of its Board of Directors must be patients of the center, "who, as a group, *represent* the individuals being served by the center . . . " (42 U.S.C. § 254b(k)(3)(H)(i)) (emphasis added); (3) an entity that provides an especially comprehensive range of primary and other health services to its patients (rarely, if ever, available in an ordinary physician's office) (42 U.S.C. §§ 254b(a) and (b)(1) and (2) and 254b(k)(3)(A)); and (4) an entity that serves all residents of its community, regardless of any resident's/patient's ability to pay.  42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G).  All other Section 330 grantees in the class here represented receive the same determination.

13.    An entity that meets such Section 330 PHS Act health center requirements uniquely advances the interests of its patients and the medically underserved communities from which its patients come.  It is situated in a community (or communities) that without its presence lacks adequate physician and other health care resources, it is controlled by its patients, and it provides services to all members of its community (or communities), including especially those who are poor, are not enrolled in any private or government insurance program and therefore cannot pay for such services.

14.    Both as a practical consequence of serving patients without the ability to pay and pursuant to Section 330 PHS Act requirements, health centers/FQHCs are required to make every reasonable effort to collect appropriate reimbursement from public and private sources, including Medicare and Medicaid.  Federal grant funds awarded pursuant to Section 330 may be used only to cover the costs that are not paid for by other sources.  42 U.S.C. § 254b(k)(3)(F).  In passing the FQHC payment provisions of the Medicare and Medicaid statutes, Congress' goal

5

was to ensure to the extent possible that Medicare (and Medicaid) fully reimbursed Section 330 grant funded health centers their costs of providing covered services to those programs' beneficiaries and were not forced to use grant funds to subsidize the care these programs made available. (As described below, as a result of Medicare's co-payment requirement, Section 330 health centers/FQHCs must cover some Medicare costs with Section 330 grant funding.)

> **B.**      **Budgets, Cost Allowability and Enforcement**

15.     Applications for Section 330 funding must "contain a budget and narrative plan of the manner in which the applicant intends to conduct the project and carry out the requirements" set forth in 42 C.F.R. Part 51c. *See* 42 C.F.R. § 51c.104(b). As implemented by HRSA and BPHC, such an application must present extensive budgetary detail to support the costs involved in carrying out the grant project and account for all of the revenue the center expects to receive in doing so. Because the cost of medical "providers" (physicians and other licensed health professionals) is significant for any Section 330 project, approval of provider staffing is based on whether that staffing results in the center operating at full capacity.

16.     The grant project is the entire span of health center activities the grantee conducts, even though certain of those activities, *e.g.*, services to Medicare patients, will be paid for wholly or partially by other federal health programs or with non-federal (*e.g.*, State, local and charitable) funds. This means that HRSA staff approving a Section 330 grantee's budget will necessarily be approving staffing costs for *all* of a center's activities irrespective of which the staff will work on patients covered by which funding source or which costs will be charged to grant funds or some other funding source, such as Medicare. Accordingly, with respect to the Medicare program, a Section 330 health center will be charging that program for staffing and costs that have already been approved by HRSA officials who oversee the Section 330 grant

program and approve Section 330 grants.

17.     As is the case with the Medicare statute, which requires FQHCs to be reimbursed for their "reasonable costs", health center regulations require that Section 330 grant budgets and grantee expenditures be only for such "reasonable costs".  Section 330 regulations, at 42 C.F.R. §51c.113, incorporate the provisions of 45 C.F.R. Part 74.  Part 74 contains administrative requirements generally applicable to all HHS grant program and activities.  In turn, Part 74, at 45 C.F.R. §74.27, specifies that the "allowability" of costs incurred by nonprofit organizations such as TLC (and other Section 330 grantees) is to be determined in accordance with Office of Management and Budget ("OMB") Circular A-122 ("A-122") ("Cost Principles for Nonprofit Organizations").  Circular A-122 is published in 2 C.F.R. Part 230.

18.     In grant (and government contract) parlance, "allowability" refers to whether a particular cost may be charged to a grant and thereby paid by the government agency issuing the grant.  As explained below, among its other requirements, OMB Circular A-122 requires grantee expenditures to be "reasonable".  The HRSA staff review leading to approval of a Section 330 grantee's budget is, among other things, designed to make certain that grantee budgets are limited to such reasonable costs.  Later scrutiny by HHS staff and auditors (described below) is, among other things, designed to identify and disapprove any unreasonable costs the grantee may, despite such prior budget approval, have incurred.  Any such identified unreasonable costs will be "disallowed" by HRSA staff and recaptured, either through a grantee payment to HHS or through offset.  This recapture applies regardless of which source or sources of funds paid the unallowable costs.  Furthermore, because the vast majority of Section 330 grant awards are made to continuing grantees, any such reasonable costs would be excluded from the new award's approved budget.  For grantees with significant problems (budgetary or otherwise), those new

7

awards typically include a "special condition" that explicitly addresses the problem or problems, by directing or prohibiting actions by the grantee.

19.     OMB Circular A-122 does not just apply to federal grants.  It also applies to all federal "contracts" with non-profit organizations made on a cost-based basis.  FAR § 31.702; 48 C.F.R. § 31.702.

20.     According to A-122, to be allowable, the particular cost or costs must meet the following general criteria:

> A.     Be reasonable for the performance of the award and be allocable thereto under these principles.
>
> B.     Conform to any limitations or exclusions set forth in these principles or in the award as to types or amount of cost items.
>
> C.     Be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the organization.
>
> D.     Be accorded consistent treatment.
>
> E.     Be determined in accordance with generally accepted accounting principles (GAAP).
>
> F.     Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period.
>
> G.     Be adequately documented.

OMB Circular A-122, 2 C.F.R. Part 225 at Att. A, § A(2)(a) – (g).  The term "allocable" (in subparagraph (A) above) means simply that the activity for which the cost is incurred must benefit or be related to the grant project.  For example, suppose that a health grantee of an HHS program (not Section 330) hired, at a salary commensurate with salaries paid in its community by similar health care entities, a social worker to meet with all grantee patients and assist them with the kinds of issues or problems for which social worker skills are employed.  The costs for

8

that social worker's salary would undoubtedly be "reasonable". However, if social worker services were not among those the grantee were authorized to provide under its HHS grant, the cost would not be "allocable" to the grant and therefore would not be "allowable". The term "allocable" as used in OMB Circular A-122 has the identical meaning as the term "related" in the FQHC payment provisions of the Medicare statute ("reasonable and related"). *See* below for discussion of such payment provisions.

      21.    OMB Circular A-122 also provides that a "cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs." OMB Circular A-122, 2 C.F.R. Part 225 at Att. A, §A(3). The Circular then provides a number of factors to which consideration should be given in determining the reasonableness of a given cost. They include:

> A. Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award.
>
> B. The restraints or requirements imposed by such factors as generally accepted sound business practices, arms length bargaining, Federal and State laws and regulations, and terms and conditions of the award.
>
> C. Whether the individuals concerned acted with prudence in the circumstances, considering their responsibilities to the organization, its members, employees, and clients, the public at large, and the Federal Government.
>
> D. Significant deviations from the established practices of the organization which may unjustifiably increase the award costs.

2 C.F.R Part 225, Att. A, §C(2)(a-e).

      22.    HHS' Bureau of Primary Health Care ("BPHC") within HHS' Health Services

and Resources Administration ("HRSA") has issued a number of guidance documents to assist

Section 330 health centers in complying with grant requirements.  One of such guidance

documents, BPHC Policy Information Notice ("PIN") 98-23, refers to "Program Expectations"

for health centers, addressing "requirements of law and regulation as well as BPHC policies."

PIN 98-23 at 3.  In particular, PIN 98-23 sets forth  a number of requirements applicable to

health center financial systems.  According to these expectations:

> At a minimum, health center programs must maintain financial
> systems which provide for internal controls, safeguard assets,
> ensure stewardship of federal funds, maintain adequate cash flow
> to support operations, assure access to care, and maximize revenue
> from non-federal sources.

PIN 98-23 at 33.

    23.    Under the same PIN, health centers are required to have accounting and internal

control systems "appropriate to the size and complexity of the organization,"  and through

financial reports regularly reviewed by appropriate management staff and members of the health

center's governing body.  PIN 98-23 at 33.

    24.    PIN 98-23 also emphasizes the importance of a health center's annual budget.  It

describes the budget as:

> . . . the culmination of negotiations among health center managers,
> clinicians, and board members as they determine the level and
> scope of services to be provided within the constraints of the
> organization's resources.  The budget, as part of the health center's
> operating plan, must attempt to accurately project both the
> resources available in the coming budget period and the
> expenditures required to achieve the health center's goals and
> objectives.

PIN 98-23 at 33.

    25.    On the same page, the PIN requires center budgets to be used to "realistically

project revenues and expenses" observing that health centers "should be able to draw upon past

10

budgetary experience and to identify significant changes anticipated in the coming period." *Id.*.

26.    Financial requirements governing Section 330 grantees are enforced through the requirement of "an independent annual financial audit of any books, accounts, financial records, files and other papers and property which relate to the disposition or use of the funds received under such grant *and such other projects received by or allocated to the project for which such grant was made*." 42 U.S.C. §254b(q)(1).  (Emphasis added.)  Section 254b(q)(2) requires centers to "establish and maintain … records … require[d] to facilitate the audit …"

27.    The foregoing audit requirements are buttressed by regulation, under which an application for a Section 330 grant must contain "an assurance that an independent certified public accountant … will be engaged to certify that the system for the management and control of its financial assets will be in accord with sound financial management practices, including applicable Federal requirements." 42 C.F.R. §51c.104(b)(6).  The allowable cost requirements under OMB Circular A-122 are among such "applicable Federal requirements".

28.    The foregoing financial and accounting requirements are also monitored by staff that oversees the Section 330 grant program.  That staff (or experts engaged by that staff) makes regular visits to grantees to ensure (among other things) that these financial requirements are being met.

### The Medicare Program

### Medicare FQHC Services

29.    The FQHC provisions of the Medicare Act became law in 1990.  The 1990 law defined FQHC services, made those services among those that must be available to all beneficiaries (hence a beneficiary right) and required cost reimbursement payment to FQHCs for the provision of services to Medicare beneficiaries.

30.    FQHC services are defined for the purposes of the Medicare program in 42 U.S.C. § 1395x(aa)(3).  They include the services of physicians and other licensed health professionals -- mid-level practitioners, clinical psychologists, social workers, and other licensed practitioners.  42 U.S.C. § 1396d(1)(2)(A) and § 1395x(aa)(1).  Other particularized Medicare services are also authorized for FQHCs.  FQHCs (uniquely among all providers of Medicare services) are specifically permitted to provide under the Medicare program for the "preventive primary services" defined in Section 330 of the PHS Act and required by that Act to be provided by Section 330 grantees to their patients.  *See,* 42 U.S.C. § 1395x(a)(3)(B).  Since 1990, the scope of FQHC services under Medicare has expanded.  For example, as recently as 2006 Congress added diabetes outpatient self-management training and diabetes medical nutrition therapy as FQHC Medicare services.

31.    Under the Medicare Act, FQHCs are entitled to special payment; specifically to reimbursement for "reasonable and related" "costs" of "furnishing [the above-described FQHC] services or which are based on other tests of reasonableness [HHS] may prescribe in regulations, including those authorized under [42 U.S.C.] section 1395x(u)(1)(A)…" because of Medicare's co-payment obligation, HHS' reimbursement to FQHCs is limited to "80 percent of such costs." 42 U.S.C. § 1395l.  *Id.*  Although the co-payment theoretically makes up the difference, because many FQHC Medicare patients are poor, under Section 330 grant requirements, FQHCs must forego some or all of such co-payments.  It is their Section 330 grants that bear those unpaid costs.

32.    The nature of the FQHC Medicare program enacted in 1990 radically changed the character of how Section 330 health centers fit into the Medicare program.  Previously, they had been treated by Medicare as just one more provider of some health services for which Medicare

12

would pay when the service was provided to one of its beneficiaries.  The payment made was the set fee other providers of the same service would be paid.  With the legislation in 1990 turning health centers into FQHCs, Medicare now has an FQHC program that mimics the Section 330 PHS Act grant program in that both programs define the services to be provided (which in Medicare's case are among the services Section 330 grantees must provide), base payment on reasonable and related or allocable costs and specify to whom services are to be provided.  The 1990 legislation also gave (practical) vitality to a provision of Section 330 that requires grantees "to collect reimbursement for health services to persons [covered by, among others, Medicare] on the basis of the full amount of fees and payments for such services *without* application of any discount."  42 U.S.C. §254b(k)(3)(G)(ii)(II) (emphasis added).  Those "fees and payments" are required to be at levels that "cover [the health center's] reasonable costs of operation …"

### Cost Reimbursement Regulations And Implementation

33.____To implement the FQHC reasonable and related cost requirements, CMS, in 1992 and 1996, issued Medicare FQHC regulations.  They are found at 42 C.F.R. § 405.2460 *et seq.* (which, at 42 C.F.R. § 405.2462(a), incorporate Medicare reasonable cost rules found in 42 C.F.R. Part 413)).

34.    The FQHC Medicare regulations on reasonable and related cost reimbursement are themselves implemented through two basic devices.  The first is a "cost report", which requires FQHCs seeking Medicare reimbursement each year to present all of the FQHCs' costs incurred for the prior year (and audited and presented by the auditors in a financial statement) in a format designed to allow the identification of costs Medicare will and will not reimburse.  The cost report allows CMS (actually CMS' fiscal intermediary) to deduct such costs from the payment due to FQHCs from the FQHCs' prior year's costs.  (The report also automatically

13

makes certain other deductions for the two limitations at issue.  These are discussed below.)

35.     The costs of the FQHC that remain eligible for reimbursement *after* the cost report is reviewed by the fiscal intermediary and the intermediary subtracts out costs Medicare does not pay become the basis of CMS' payment to the FQHCs for Medicare services provided. This brings into play the second basic "device" used by CMS for determining FQHC payments - - something called an All Inclusive Reimbursement Rate.  That rate is produced by dividing the remaining (after intermediary review) costs on the cost report by the number of "visits" the FQHC has conducted for *all* of its patients in the prior year (for services the Medicare program authorizes) and multiplying all such visits for Medicare patients by that per visit cost.  Stated otherwise, through the device of a "cost report", an FQHC shows its total (audited) operational costs for the previous year.  From those costs, the costs that Medicare does not pay for are subtracted.  Of the remainder, Medicare's allocated share is determined by Medicare's percentage of the center's total number of Medicare covered service "visits" for all (not just Medicare) patients.  Thus, if the FQHC's Medicare visits represent 10 percent of all of those visits during the year, Medicare's share of the costs will be 10 percent.

36.     The foregoing methodology of calculating FQHC reimbursement contains a "catch" with respect to Medicare's definition of "visits".  As background, Medicare defines the term "visit" as a face-to-face encounter between the patient and a physician, physician assistant, nurse practitioner, nurse midwife, visiting nurse, clinical psychologist, or clinical social worker during which an FQHC service is rendered.  42 C.F.R. § 405.2463(a).  The catch is that encounters with more than one health professional and multiple encounters with the same health professional that take place on the same day and at a single location constitute only a single visit for Medicare payment purposes.  (There are very limited exceptions under 42 C.F.R. §

14

405.2463(a)(2)).  Medicare payment is therefore predicated on an allocation of FQHC costs by this one visit per day approach.  42 C.F.R. § 405.2463(a)(4).

37.    The reason that approach is described herein as a "catch" is that health centers are encouraged by HRSA and considerations of good medical practice to conduct multiple visits on the same day -- visits that would not qualify for the limited exceptions to the one day per visit rule.  Many of the centers' patients have chronic conditions and/or face difficulties in securing transportation to their center.  Accordingly, when these patients come to the health center for *any* service, the center will take advantage of the fact that the patient is then available and provide that patient with follow-up or other services the patient needs.  In this way, the centers make certain that the patient actually is given *all* the treatment *he/she* should be given.  The system of reporting Section 330 grantee performance to BPHC/HRSA calls for centers to count and report all such "multiple" visits.

38.    To conform to the one visit per day rule on their cost reports, FQHCs only charge the single (first) visit to a Medicare patient and do not show the next visit or two or three visits provided to that patient on the report (and routinely reported to BPHC).  Thus, for cost report purposes, Medicare only knows the FQHC has provided one visit to one Medicare beneficiary. The fact that the FQHC may have had two or three doctors or other providers separately seeing and dealing with the Medicare patient on serious, time-consuming medical issues during that day is completely obscured.

39.    One result of this one day per visit policy is to make the FQHCs' costs per visit they report to Medicare appear comparably high.  Unless someone actually knows how many actual visits (with commensurate time and effort of physicians or other providers) are being represented by the single visit reflected on the Medicare cost report, there is no way to assess

15

whether the FQHCs' costs per visit as reflected in their cost reports are "reasonable". The one visit per day rule also reduces the rightful share of total FQHC visits Medicare should cover. Because of the ages of the Medicare population and other factors related to the population, the time and effort (and added care through added visits) spent on such patients tends to be greater than for other populations FQHCs serve. As a result of the one visit per day rule, this tendency is not tracked and not paid for by Medicare.

40. Once the FQHC prepares its cost report and submits the report to the Medicare fiscal intermediary, the intermediary reviews that report, determines the per visit rate and conducts a year-end "reconciliation" based on actual costs, the number of Medicare visits, and payments made to the health center during the year. The reconciliation involves the following: (1) computing the amount the FQHC has previously been provisionally paid (*via* advances for the year final payment is sought); and (2) subtracting those payments from the amount finally due the center, which is calculated from information in the cost report. The end result may be that the FQHC owes money back to the Medicare program. More likely, it will be due an added Medicare payment. *See, e.g.* 42 C.F.R. § 413.64; § 405.2466 (applicable to annual reconciliation).

### Unlawful Medicare Cost Limits

41. The above computation of the amounts FQHCs are due includes two "adjustments" that impose the limitations plaintiff herein contends are unlawful. As with a 1040 form for computing federal taxes, these two adjustments are made as a result of the itemized step or steps the cost report requires a preparer to take in getting to the final amount owed, *e.g.*, "if line 34 is greater than X, place X in this line and use it in further calculations." The two adjustments are a per visit payment cap and a physician/provider productivity screen.

16

## The Per Visit Cap

42.    The per visit cap (conceptually) works in the following way.  Assume an FQHC's "allowable costs" for the year in question were $10,000.  Assume all FQHC visits by all patients for services covered by Medicare in that year (using the one visit per day rule previously described) were 1,000.  Assume finally that the number of Medicare patient visits (out of that 1,000) were 100.  The FQHC's per visit rate could be $10.  Medicare's share of the above $10,000 of costs would be 10 percent of the visits and 10 percent of the costs, or $1,000.  (Another way of computing it would be $10 per visit x 100 visits.)  But, before Medicare pays the FQHC the 10 percent or $1,000 (or reconciles that $1,000 to the amount previously advanced to the FQHC), it applies its already established per visit "cap".  If, for example, that cap happened to be $9 per visit, the particular FQHC with a $10 per visit of (otherwise) allowable and reimbursable cost would see its cost report automatically adjust its payment level down to $9 per visit.  The result would be that Medicare would pay the FQHC only $9 x the FQHC's 100 Medicare visits, or $900.  The cap in this hypothetical instance would cost the center $1 per visit, or a total of $100.

## The  Provider Productivity Screen

43.    The second limit challenged herein is the so-called provider productivity screen.  The productivity screen is measured as the number of health center visits per full time equivalent ("FTE").  (An FTE is defined as the number of hours per year for which one employee of that type must be compensated to meet the health center's definition of a full-time employee, or a minimum of 1,600 hours per year.)  The productivity standard for an FQHC is a minimum of 4,200 annual visits for each FTE physician and 2,100 annual visits for each FTE mid-level practitioner.

44.    The screen is applied as follows: if the FQHC's number of visits per FTE is below the minimum standard, that minimum is substituted as the denominator for the calculation. However, if the productivity standards of 4,200 or 2,100 are exceeded, the actual number of visits is used. Accordingly, if an FQHC had only a single doctor on staff and that doctor had only 3,800 patient visits in a year, the health center's reimbursement would be limited to 90.4 percent (3,800/4,200) of the FQHC's reasonable costs of providing those visits. If the doctor performed 4,500 visits, no adjustment would be made. As with the per visit cap, an automatic adjustment for the screen is built into the FQHC Medicare cost report. (The adjustment for the screen precedes the adjustment for the cap.)

## Cap and Screen Rulemakings

45.    The Medicare FQHC payment cap and productivity screen were first established in the preamble to CMS' FQHC "final rules with comment period" in 1992. 57 *Fed. Reg*. 24961 (June 12, 1992). According to that preamble, the cap was to have only interim status, pending sufficient "FQHC cost experience". The 1992 rules were reissued in 1996 without substantial rule changes or any change to the cap or screen. 61 *Fed. Reg.* 14640 (April 3, 1996). The 1996 preamble also indicated that the cap was to be only an interim device pending such actual cost experience.

## Absence of "Cost Experience"

46.    The "cost experience" referenced by CMS in the preambles accompanying the 1992 and 1996 rulemakings was to the fact that CMS did not, in setting the cap or screen, review actual FQHC cost data, even though by the time of the 1996 rules, five years of such data were accumulated. Despite promises in the 1992 and 1996 preambles to review such data, to this date CMS has never done so. Its 1992 and 1996 rulemakings and whatever deliberations have

18

accompanied its continuation of the cap and screen (until today) have never included a review of actual FQHC Medicare costs, much less the effect of the two limitations, including whether that effect fairly measured the "reasonable and related costs" the statute requires FQHCs to be reimbursed.

### Inside CMS -- The True Cap and Screen History

### The Cap

47.     The entire reason there is a cap on FQHC Medicare per visit costs is that the head of the unit within CMS that was responsible for developing the 1992 (and 1996) FQHC rulemakings personally wanted a cap and instructed his staff working on the FQHC rules to impose one.  The rationale for the cap in the preamble to the 1992 rules was that Congress wanted the FQHC payment methodology "to parallel the RHC payment requirements."  (The Rural Health Clinic ("RHC") payment requirement was legislatively established more than 10 years before the FQHC legislation and in 1992, unless the FQHC legislation, included a Congressionally-imposed cap).  57 *Fed. Reg.* 24968.  This rationale was something that staff made up on its own.  Beyond whatever *pro forma* review by senior officials accompanied the two rulemakings, the rationale was never reviewed or approved by HHS attorneys or other CMS officials (save the head of the aforementioned unit and his order taking minions).  The truth is that the bias of an obscure career official was the entire reason the cap was imposed.

48.     That the rationale that Congress wanted HHS to treat FQHC payment just like RHC payment was conjured by staff and never specifically approved or even discussed with HHS officials who had proper authority to interpret laws on HHS' behalf is clear from just the following four facts:  (1) RHCs, unlike FQHCs, are not HHS grantees subject to the rules of accounting and budgeting oversight, applicable to the Section 330 Public Health Service Act

19

program, as described above; (2) Congress itself had imposed a per visit cap on RHC payments (at 42 U.S.C. § 1395l(f)) and did not do so for FQHCs; (3) under the parallel Medi*caid* FQHC program, which requires the use of the same cost reimbursement requirements used in the FQHC Medicare program (by referring specifically to whatever was "prescribe[d] in regulations under [42 U.S.C.] section 1395l(a)(3)", neither the cap nor screen is required by CMS and States are allowed to pay FQHCs (and be reimbursed the federal share of such payments) without imposing those or any other similar kinds of limits; and (4) Congress in relevant legislative history emphasized that in defining the reasonable and related costs FQHCs were to be paid, it wanted CMS to use the actual costs FQHCs were incurring.

49.     CMS' continuation of the cap and screen after 1996 not only ignored its pledge to review and adjust for actual cost experience, but also ignored the fact that certain new services have since been added to the Medicare FQHC service package. CMS, in addition, has never considered, much less analyzed, whether its one visit per day rule or the MEI adjustment adequately or accurately measures FQHCs' (individually or collectively) reasonable and related costs. On information and belief, the MEI adjustment does not adequately or accurately account for such increases and falls well short of what such increases actually are.

### The Screen

50.     CMS' history regarding its imposition of the productivity screen is an equal dereliction of responsibility. According to the 1992 FQHC rulemaking preamble, CMS' rationale for imposing the screen was that "[t]he productivity screening guidelines [CMS had previously applied to Rural Health Clinics] conform to those set by the Public Health Service for clinics receiving funds from that agency." 57 *Fed. Reg.* 24967. (June 12, 1992). Thus, CMS' decision to impose the screen was predicated entirely on the imposition of the same screening

20

device used by HRSA officials in administering the Section 330 grant program. The statement was actually untrue because Section 330's productivity standard did not include the one day per visit limit.

51.    Far more problematic, however, is the fact that within a period of months after the 1992 rulemaking Section 330's productivity screen was withdrawn by HRSA/BPHC because of quality of care reasons. Notwithstanding this, in the preamble to the 1996 FQHC rulemaking, CMS' rationale for the productivity standard remained the same: "we adopted the productivity screening guidelines used by HRSA. We continue to use the HRSA guidelines." 61 *Fed. Reg.* 14650. In the only federal case to consider CMS' false premise for continuing to use the productivity screen, the district court described it as a "bureaucratic bungle."

## NACHC Study

52.    The only study to be made of actual costs FQHCs incur for Medicare patients and the impact of the cap on such costs was conducted by the National Association of Community Health Centers ("NACHC"). NACHC's study came about as a result of a directive of the (then) Secretary of HHS (Tommy Thompson) to CMS to reconsider the cap. After making a Freedom of Information Act ("FOIA") request, CMS arranged for NACHC to receive FQHC cost reports from the fiscal intermediary for the period June 2002 through May 2003. At that point, NACHC itself conducted the study. NACHC found that 75 percent of FQHCs nationwide had actual costs above the cap. NACHC estimated that because of the cap health centers were losing over $51 million each year, with some of the largest Medicare sites losing over $1 million as a result of the cap. This estimate was generous to CMS because the FQHC cost report adjusts for the screen before the cap is applied. As a consequence, the FQHCs' costs that are subject to the cap are already less than those FQHCs' actual and otherwise allowable costs. Stating it otherwise,

21

had NACHC considered the impact of the screen *plus* the cap, the number of centers that would have been affected would have been even higher.  Had that total been a mere 80 percent, CMS' two cost limits would be second guessing HRSA officials' determinations of reasonable health center costs for eight out of every ten Section 330 grants made.

53.     To make matters worse, NACHC found that the imposition of the cap most significantly affected health centers that provide a broad range of Medicare-covered services, those in higher cost areas, and those with sicker populations who needed more health services.  Thus, the second guessing by CMS through its two limits has greater impact on the centers with higher Medicare populations and greater health care needs.

54.     NACHC, of course, provided the results of its analysis to CMS.  CMS has never even asked for the costs reports on which NACHC based its findings, and has, despite continued entreaties from NACHC, continued to maintain the same 1992 cap that was created by bureaucratic *fiat*.

**Failures to Consider**

55.     In developing the two limitations, imposing them in the 1992 and 1996 FQHC rulemakings and continuing to use them thereafter, CMS failed and has continually failed to consider important factors relating even to having such limitations in the first instance.  And even assuming factual and legal justification for such limits exists, CMS has failed to consider important factors in setting those limits.  The important factors CMS has neglected to consider include, but are not limited to:

(A)     That throughout the (now) seventeen year history of the Medicare FQHC program, CMS, in adopting and continuing the cap and screen, has never, even once, considered actual FQHC costs.

(B)    That all FQHC costs for an ensuing year are originally approved by HHS officials as part of the Section 330 grant making process:

(C)    That all such Section 330 grantees are independently audited each year under a statute that requires such audits to cover all federal requirements;

(D)    That one of the requirements imposed on Section 330 grantees and dealt with in the grantee's budget and audit is that the costs it may charge must be reasonable and allocable;

(E)    That CMS, in imposing the two limits on expenditures here at issue, is taking funds away from Section 330 grantees and forcing grantees to subsidize the Medicare program with their Section 330 grant funds;

(F)    That based on NACHC's study, by utilizing just the cap, CMS imposes cost reductions on 75 percent of the Section 330 grantees and that the impact is greater on centers with the most Medicare patients and greater patient needs;

(G)    That CMS promised in 1992 and 1996 to consider actual FQHC cost experience and has not kept that promise;

(H)    That CMS, in its 1996 rulemaking, has one justification for the productivity screen -- which is a mistake;

(I)    That Section 330 grantees are encouraged by HRSA and BPHC and considerations of good medical practice to provide multiple visits on the same day for their patients;

(J)    That Medicare patients may be more difficult to treat and require more FQHC visits than other groups of FQHC patients;

(K)    That to the extent Section 330 grantees must subsidize care to Medicare patients as a result of the two limits, they will have less ability to serve those in their communities whose

23

only care alternative will be a more costly hospital emergency room visit;

(L)    That access to FQHCs for Medicare patients is adversely affected because of the two limits;

(M)    That despite CMS' insistence on using the two limits for Medicare -- based on the statutory requirement of "reasonable and related costs" -- the very same CMS, with respect to an FQHC Medicaid program statute requiring the same "reasonable and related costs" does not require States to impose such limits and willingly pays its share of Medicaid costs States pay to FQHCs, without such limits;

(N)    That the MEI does not (or may not) accurately track FQHC cost inflation; and

(O)    That after 1992 new FQHC services have been legislatively added to the Medicare program.

56.    In addition, CMS has failed to consider the nature of FQHCs including the oversight of FQHCs conducted by HRSA and independent auditors.  That FQHCs receive such intense scrutiny, at barest minimum, would suggest that imposition of further limitations on FQHC cost reimbursement by the Medicare program might be unnecessary or might eat into, rather than accurately measure, the reasonable and related costs of FQHCs in treating Medicare beneficiaries.

**Supervening HHS Cost Reimbursement Requirements**

57.    One more important consideration CMS failed to make in regard to FQHC Medicare cost reimbursement is both legal and practical -- CMS' reliance on its own body of cost reimbursement rules rather than those health centers otherwise must follow.  As explained above, OMB Circular A-122 applies to Section 330 grants and even would apply to "contracts" between federal agencies and Section 330 grantees.  For CMS not to consider whether the

24

requirements of that Circular and Section 330 regulations were more appropriate than its own made up for the first time in 1992 FQHC rules, especially considering that those first time rules incorporated cost reimbursement rules for *hospitals*, is a significant failing and symptomatic of CMS' many failures to consider all of the previously-described ways FQHCs are regulated by federal program officials and authorities.

58.    CMS' failure to consider using the reimbursement rules health centers otherwise must abide by also ignored a legal reality -- that HHS' cost reimbursement regulations within 45 C.F.R. Part 74, which incorporate and make applicable the requirements of OMB Circular A-122 to all Departmental grant programs (save for a few exceptions or deviations not applicable here), explicitly cover FQHC Medicare cost reimbursement and *on their face* supersede CMS' FQHC cost reimbursement requirements.  Circular A-122 has no such limits as the cap or screen here at issue and bars imposition of additional requirements by departments and agencies (as does Part 74 for HHS) without explicit permission.  No such permission exists.

### HARM

59.    The effect of the Medicare FQHC cap and the provider productivity screen is to cause a high percentage of the FQHCs that provide services to Medicare beneficiaries to lose money.  As Congress found when it first authorized the FQHC program (in 1989 for Medicaid), the result of a failure to pay FQHCs their reasonable and related costs of treating Medicaid and Medicare patients is that the FQHCs are forced to draw on their Section 330 PHS grants to cover that loss.  This means that the affected FQHCs have less grant funds available to provide services to their poor, uninsured patients.

60.    The further consequence of the two limits is to significantly discourage FQHCs from participating in Medicare.  FQHCs, through networking, community meetings,

25

undertakings of their Boards of Directors, *etc.*, influence the volume and type of patients they serve. A center that faces losses when it treats Medicare beneficiaries and thereby reduces its capacity to serve those who lack insurance and access to other care (as opposed to Medicare beneficiaries who at least have an insurance card most doctors will accept) will tend to keep its Medicare population relatively low. Accordingly, FQHC services, legally a Medicare patient entitlement, are being rationed where Medicare beneficiaries are concerned. As such, these beneficiaries are being deprived of FQHC services that may be of substantial benefit to them. These include, but are not limited to: high-quality care, a wider scope of Medicare covered services than authorized for any other provider, free or lower cost care (no or small co-pay) if the beneficiary cannot afford to pay the entire amount of co-pay, and transportation and translation services, if needed.

61. Moreover, to the extent an FQHC is unable or because of community necessities is unwilling to limit its Medicare population, it will tend to adopt management strategies to limit is Medicare losses, including : (1) pushing its doctors and other providers to conduct more visits, thereby reducing its Medicare per visit rate and to stay under the cap and over the productivity screen; and (2) catering to the one visit per day rule by insisting that Medicare patients who require further care after their initial visit make follow-up appointments for such care on another day. Both strategies impede or have the potential to impede the provision of good medical care.

## **FIRST CAUSE OF ACTION**

### **(Unlawful Medicare Cap)**

62. CMS' failure to consider the facts and factors described and enumerated above in this Complaint constitutes a failure to consider important aspects of the matter at issue; namely,

26

whether to impose any limit on costs to be reimbursed and, if so, what that limit or limits should properly be.  As such, the per visit cap is arbitrary and capricious, and unlawful.  The per visit cap is additionally unlawful and arbitrary and capricious for the reasons stated in succeeding paragraphs.

63.    Assuming CMS relied on the authority under 42 U.S.C. 1395*l* and 1395x(v)(1)(A) for imposing the per visit cap, it failed to do what section 1395x(v)(1)(A) requires; specifically to follow that section's statement that "[t]he reasonable cost of any services shall be the cost *actually incurred*, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  (Emphasis added.)  To do what that section requires, the necessary first step to imposing any limits is to begin with what costs actually were incurred.  CMS has failed to take that step.

64.    Section 1395x(v)(1)(A) further provides that the reasonable cost of any services "shall be determined in accordance with regulations establishing the method or methods to be used . . . "  In prescribing such regulations, the Secretary of HHS "shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipient of services. . ."  *Id*.  The regulations must also ensure that the necessary costs of efficiently delivering Medicare covered services to Medicare beneficiaries "will not be borne by individuals not so covered" by the Medicare program.  *Id*. Each of these requirements was completely ignored by CMS in imposing and continuing to impose the cap (and the screen).

65.    In passing legislation authorizing the FQHC program, Congress made clear that it wanted HHS to rely on actual costs in making determinations of whether costs are "reasonable

and related".  H.R. Rep. No. 101-247, at 392-93, *reprinted in* 1989 U.S.C.A.A.N. 2118-19.

CMS has ignored this directive in instituting and continuing to utilize the per visit cap.

66.    Application of the Medicare per visit cap causes FQHCs to use their PHS Act

grant funds to subsidize costs eliminated by the per visit cap -- a result that is specifically

prohibited by 42 U.S.C. § 1395x(v)(1)(A) and applicable regulation as well as 42 U.S.C.

§254b(k)(3)(G)(ii)(II).  The subsidy also has Constitutional implications.  Money can be drawn

from the Treasury only through "Appropriations made by Law."  Art. I, §9.  *See also* Art. IV, §3

(Congress' unique power over "Property belonging to the United States…").  When laws passed

by Congress command that there be no such subsidy, HHS, by imposing that subsidy, has

assumed authority uniquely possessed by Congress.

67.    The mere presence of the Medicare per visit cap and its potential application to a

health center's Medicare reimbursement has an adverse effect on the conduct and operations of

FQHCs, causes or tends to cause bad medical practice and deprives Medicare beneficiaries

and/or others in need of access to FQHC services of those services.  As such, it penalizes all

(actual and potential) health center patients.

## SECOND CAUSE OF ACTION

### (Unlawful 4200 Visit Physician Productivity Screen)

68.    Each and every failing and legal violation enumerated in the First Cause of

Action is equally applicable to and/or true for the physician productivity screen.

69.    In addition CMS' entire premise for the productivity screen in the final rule was

false -- "[w]e use the same guidelines applied by HRSA . . . We believe it is appropriate to use

uniform productivity guidelines rather than developing separate guidelines."  61 *Fed. Reg.*

14,640, 14,651.  Aptly named a "bureaucratic bungle", the screen's adoption and continued use

based on such a false premise is arbitrary, capricious and unlawful.

70. The mere presence of the Medicare productivity screen and its potential application to a health center's Medicare reimbursement has an adverse effect on the conduct and operations of FQHCs, causes or tends to cause bad medical practice and deprives Medicare beneficiaries and/or others in need of access to FQHC services of those services. As such, it penalizes all (actual and potential) health center patients.

### THIRD CAUSE OF ACTION

### (Unlawful Reliance on Superseded Requirements)

71. By virtue of OMB Circular A-122 (along with the authority of OMB to issue a Circular binding on HHS' Medicare program) and HHS' adoption of that Circular in its own regulatory system as applying to all of its grant programs (with exceptions not relevant here) as well as that Circular's applicability under the FAR to all HHS "contracts", notwithstanding the requirements the Medicare program has imposed on FQHC payment, those requirements, including the limitations here at issue, have been superseded by such other requirements. CMS is bound to follow HHS, OMB regulations and the FAR, which bar the imposition of the two limitations at issue.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and all others similarly situated, pray that this Court enter an order:

1. Certifying the proposed plaintiff Class, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

2. Declaring that the Medicare per visit cap and productivity screen are arbitrary, capricious and otherwise unlawful.

3.      Enjoining HHS'/CMS' further use of the cap or screen and directing appropriate adjustments in payments to FQHCs whose payments are currently reduced by one or both of those cost limiting devices.

4.      Subject to the applicable statute of limitations, ordering HHS to re-calculate past FQHC payment rates paid under the Medicare program to remove application of the cap and screen, and paying FQHCs the difference.

5.      Directing the payment of attorneys' fees and costs for the bringing of this action.

6.      Retaining jurisdiction over this action to ensure that HHS fulfills all the requirements of this Court's order.

7.      Providing such other and further relief as the Court may deem lawful and just.

Respectfully submitted,


_____
James L. Feldesman (D.C. Bar No. 023796)
Kathy S. Ghiladi (D.C. Bar No. 435484)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C.  20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiff*


Date: May 4, 2007

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Three Lower Counties Community Services, Inc.

88888 Somerset

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

U.S. Department of Health and Human Services and Secretary Michael Leavitt

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

James L. Feldesman and Kathy S. Ghiladi
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W.
Washington, DC 20036    202-466-8960

Case: 1:07-cv-00844
Assigned To : Huvelle, Ellen S.
Assign. Date : 5/4/2007
Description: Admn. Agency Review

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

O 1 U.S. Government Plaintiff

X 2 U.S. Government Defendant

X 3 Federal Question
(U.S. Government Not a Party)

O 4 Diversity
(Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | ● 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | ● 2 | O 2 | Incorporated and Principal Place of Business in Another State | O 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

O **A.** *Antitrust*

☐ 410 Antitrust

O **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

X **C.** *Administrative Agency Review*

X 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

O **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

O **E.** *General Civil (Other)*    **OR**    O **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

NOT USA
NOT USA$

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

42 U.S.C. 13951 and 1395x et seq.; 5 U.S.C. 702- review of two cost limits used in the Medicare program

| **VII. REQUESTED IN COMPLAINT** | ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ **JURY DEMAND:** | Check YES only if demanded in complaint YES ☐  NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

DATE **5/4/07**    SIGNATURE OF ATTORNEY OF RECORD _Cathy S. Shalodi_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed *only* if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

