# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THREE LOWER COUNTIES COMMUNITY HEALTH SERVICES, INC., *et al.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00844 |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) | |
| *Defendants.* | ) ) | |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiff Three Lower Counties Community Services, Inc., through counsel, hereby moves this Court pursuant to Fed. R. Civ. P. 23 and Local Rule 23 to certify in the above-captioned matter a class consisting of all Federally-qualified health centers and "look-alikes" (collectively, FQHCs) participating in the Medicare program. A Memorandum of Points and Authorities in support of this motion is submitted herewith.

Respectfully submitted,

September 7, 2007

*(signature)*

James L. Feldesman (D.C. Bar No. 023796)
Kathy S. Ghiladi (D.C. Bar No. 435484)

Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THREE LOWER COUNTIES COMMUNITY HEALTH )
SERVICES, INC., *et al.*, )
)
       *Plaintiffs,* )
)
     v. )    Case No. 1:07-cv-00844
)
U.S. DEPARTMENT OF HEALTH AND HUMAN )
SERVICES, *et al.,* )
)
       *Defendants.* )

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

### I. INTRODUCTION

This case is concerned with actions of officials of the U.S. Department of Health and

Human Services and its Secretary (collectively, "HHS") toward Federally-qualified health

centers ("FQHCs") in the Medicare program.

Plaintiff Three Lower Counties Community Services, Inc. ("TLC") is a tax-exempt (IRC

§501(c)(3)) Maryland nonprofit corporation located in Princess Anne, Maryland, and a current

recipient of grant funding under Section 330 of the Public Health Service ("PHS") Act, 42 U.S.C.

§ 254b. Any such grantee (other than one receiving funding under subsection (h) of Section 330)

is treated under the Medicare (and Medicaid) statutes as a FQHC. The other Section 330 (non-

subsection (h)) grantees on whose behalf this action is brought, with the very limited exception

of public agency grantees under subsection(2)(A) of Section 330, are also tax-exempt, (IRC

§ 501(c)(3)) non-profit organizations.

All Section 330 grantees are required, under Section 330(k)(3)(E)(i)(II), to participate in the Medicare program. Section 330 funding is made available to deal with a "medically underserved population" (described in Section 330(a)(3)(g), (h) and (i)). These are populations with shortages of doctors and other health care "providers" or populations, such as migrants that typically have troubles in obtaining medical care.

A.    **Section 330 PHS Act Grant Program**

Before a Section 330 grantee receives an award of funds, HRSA first determines that the grantee meets the following requirements: (1) is located in a medically underserved area or serving a medically underserved population (42 U.S.C. § 254b(a)(1)); (2) is community-based (a majority of its Board of Directors must be patients of the center, "who, as a group, *represent* the individuals being served by the center . . . " (42 U.S.C. § 254b(k)(3)(H)(i)) (emphasis added); (3) provides an especially comprehensive range of primary and other health services to its patients (rarely, if ever, available in an ordinary physician's office) (42 U.S.C. §§ 254b(a) and (b)(1) and (2) and 254b(k)(3)(A)); and (4) serves all residents of its community, regardless of any resident's/patient's ability to pay. 42 U.S.C. §§ 254b(a)(1) and 254b(k)(3)(G).

By virtue of these unique requirements, Section 330 grantees are designed and intended to advance the interests of their patients and the medically underserved communities from which their patients come. This is why TLC and other Section 330 grantees (the "Class") are rightfully able to claim in this case that they truly represent the interests of their patients and the communities from which their patients are drawn.

Under the Medicare Act, FQHCs are entitled to special payment; specifically to reimbursement for "reasonable and related" "costs" of "furnishing [the above-described FQHC] services or which are based on other tests of reasonableness [HHS] may prescribe in regulations,

2

including those authorized under [42 U.S.C.] section 1395x(u)(1)(A)…" Because of Medicare's co-payment obligation, HHS' reimbursement to FQHCs is limited to "80 percent of such costs." 42 U.S.C. § 1395l. *Id.* Although the co-payment theoretically makes up the difference, because many FQHC Medicare patients are poor, under Section 330 grant requirements, FQHCs must forego some or all of such co-payments. It is their Section 330 grants that bear those unpaid costs.

With the legislation in 1990 that turned health centers into FQHCs, Medicare had an FQHC program that mimics the Section 330 PHS Act grant program in that both programs define the services to be provided (which in Medicare's case are among the services Section 330 grantees must provide), base payment on reasonable and related or allocable costs and specify to whom services are to be provided. The 1990 legislation also gave (practical) vitality to a provision of Section 330 that requires grantees "to collect reimbursement for health services to persons [covered by, among others, Medicare] on the basis of the full amount of fees and payments for such services *without* application of any discount." 42 U.S.C. §254b(k)(3)(G)(ii)(II) (emphasis added). Those "fees and payments" are required to be at levels that "cover [the health center's] reasonable costs of operation …"

The mere presence of the Medicare per visit cap and the provider productivity screen and their potential application to a health center's Medicare reimbursement has an adverse effect on the conduct and operations of FQHCs, causes or tends to cause bad medical practice and deprives Medicare beneficiaries and/or others in need of access to FQHC services of those services. As such, it penalizes all (actual and potential) health center patients.

The effect of the Medicare FQHC cap and the provider productivity screen is to cause a high percentage of the FQHCs that provide services to Medicare beneficiaries to lose money. As

Congress found when it first authorized the FQHC program (in 1989 for Medicaid), the result of a failure to pay FQHCs their reasonable and related costs of treating Medicaid and Medicare patients is that the FQHCs are forced to draw on their Section 330 PHS grants to cover that loss. This means that the affected FQHCs have less grant funds available to provide services to their poor, uninsured patients.

The further consequence of the two limits is to significantly discourage FQHCs from participating in Medicare. FQHCs, through networking, community meetings, undertakings of their Boards of Directors, *etc.*, influence the volume and type of patients they serve. A center that faces losses when it treats Medicare beneficiaries and thereby reduces its capacity to serve those who lack insurance and access to other care (as opposed to Medicare beneficiaries who at least have an insurance card most doctors will accept) will tend to keep its Medicare population relatively low. Accordingly, FQHC services, legally a Medicare patient entitlement, are being rationed where Medicare beneficiaries are concerned. As such, these beneficiaries are being deprived of FQHC services that may be of substantial benefit to them. These include, but are not limited to: high-quality care, a wider scope of Medicare covered services than authorized for any other provider, free or lower cost care (no or small co-pay) if the beneficiary cannot afford to pay the entire amount of co-pay, and transportation and translation services, if needed.

Moreover, to the extent an FQHC is unable or because of community necessities is unwilling to limit its Medicare population, it will tend to adopt management strategies to limit is Medicare losses, including : (1) pushing its doctors and other providers to conduct more visits, thereby reducing its Medicare per visit rate and to stay under the cap and over the productivity screen; and (2) catering to the one visit per day rule by insisting that Medicare patients who

require further care after their initial visit make follow-up appointments for such care on another day. Both strategies impede or have the potential to impede the provision of good medical care.

## II.  ARGUMENT

### A.    The Proposed Class

Plaintiff proposes that the Class in this case be comprised of all FQHCs (including both Section 330 grantees and designated FQHC "look-alikes" - hereinafter collectively "FQHCs") that participate in the Medicare program.  Plaintiff seeks certification of this class under Rule 23(b)(1) and/or Rule 23(b)(2).  This class is also suitable for certification under Rule 23(b)(3).

### B.    The Applicable Standard

Class actions are designed to increase the efficiency and economy of multi-party litigation by allowing certain plaintiffs to join their claims together in a single action against a common defendant.  *Califano. v. Yamaski*, 442 U.S. 682, 701 (1979); *General Tel. Co. v. Falcone*, 457 U.S. 147, 155 (1982); *McCarthy v. Kleindeist*, 741 F. 2d 1406, 1410 (D.D.C. 1984). As the Supreme Court has observed, "class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class.  For in such cases, the class action device saves the resources of both the courts and the parties by permitting an issue affecting every class member to be litigated in an economical fashion." *Falcone*, 457 U.S. at 155.

Under Rule 23 of the Federal Rules of Civil Procedure, four conditions must be met for a class to be certified: (1) joinder of all members as parties must be impractical; (2) questions of law or fact must be common to the class; (3) the representative parties must be typical members

of the class; and (4) the representatives must fairly represent the interests of the class. *Falcone*,

457 U.S. at 156; *Hartman v. Duffey*, 19 F. 3d 1459, 1468 (D.C. Cir. 1994); *McCarthy v.*

*Kleindeist,* 741 F. 2d at 1410.

**C.    The Proposed Class Satisfies the Requirements of Rule 23**

Rule 23(a) permits a case to be maintained as a class action if: (1) the class is so

numerous that joinder of all members is impracticable; (2) there are questions of law or fact

common to the class; (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class; and (4) the representative parties will fairly and adequately

protect the interests of the class.  The proposed class satisfies each of these requirements.

**1.    The hundreds of proposed FQHCs participating in Medicare
make joinder impracticable**

There is no strict numerical test for determining impracticability of joinder.  Rather, "the

numerosity requirement requires examination of the specific facts of each case and imposes no

absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).   Therefore,

while numbers alone do not determine the practicability of joinder, "[g]enerally, the numerosity

requirement is satisfied where the class exceeds 100 members," *Kromnick v. State Farm Ins.*

*Co.*, 112 F.R.D 124, 126 (E.D. Pa. 1986).  Here, where there are potentially in excess of 1,000

class members throughout the United States, the grounds for numerosity have been met.  Joinder

of all or even a substantial percentage of class members before the Court as individual plaintiffs

clearly would be impracticable.

According to the HRSA website, HRSA funds over 1,000 health centers.  See

www.bphc.hrsa.gov , as of September 7, 2007.  Of those 1,000 it is not known how many

currently participate in the Medicare program - - this number may be somewhat fluid as

individual health centers enter or exit the program. In addition, there are health centers that are deemed by the Bureau of Primary Health Care (BPHC") within HRSA as "FQHC look-alikes" that may participate in the Medicare program and are eligible to receive FQHC reimbursement even though they do not receive grant funds from HRSA. These look-alikes are not included in HRSA's "over 1000" figure.

## 2.    The proposed Class shares common questions of law and fact

The commonality requirement of Rule 23(a)(2) "will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class." See generally *Wagner v. Taylor*, 836 F. 2d 578, 592 (D.C. Cir. 1987). "Commonality is satisfied where the plaintiffs' claims revolve around questions of law that will affect all members of the potential class." *Hartman v. Duffy*, 158 F.R.D. at 537, quoting *Littlewolf v. Hodel*, 681 F. Supp. 929 (D.D.C. 1988). The class therefore does not have to share all questions of law or fact in common. Commonality exists "as long as the members of the class have allegedly been affected by a general policy of the defendant and the general policy is the focus of the litigation." *Day v. NLO, Inc.*, 144 F.R.D. 330, 333 (S.D. Ohio 1992).

Here, the plaintiffs seek injunctive relief against a defendant engaging in a common course of conduct toward them. The first and second causes of action in this case contend that the Medicare cap and the physician productivity screen are unlawful and seek: (1) a declaration that these limits are arbitrary, capricious and otherwise unlawful and (2) an injunction prohibiting further use of these two particular cost limits. The facts as to the two cost limits and defendant's promulgation of them do not turn on events unique to plaintiffs. Additionally, the same legal standards govern the regulatory challenges to these two limits that are asserted by the plaintiffs.

3.    **The claims of the named plaintiff are typical of those of the proposed Class**

The typicality requirement under Rule 23 (a)(3) assesses whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented.  Such alignment generally exists when the representative plaintiff and the proposed Class challenge the same unlawful course of conduct.  Here, the typicality requirement is met because the named plaintiff, TLC, is challenging the same limits and events that give rise to the claims of all members of the proposed Class.

4.    **The plaintiff and their counsel will adequately represent the proposed Class**

The inquiry under Rule 23(a)(4) has two components designed to ensure that the absent class members' interests are pursued fully: (1) "the interests of the named plaintiffs must be sufficiently aligned with those of the absentees" that it is unlikely that conflicts of interest will arise [*Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)]; and (2) class counsel must be qualified and must serve the interests of the entire class.

The requirement that a representative's interests not diverge from those of other class members "is largely an alternative manner of stating" the typicality requirement.  3B James Wm. Moore, et al., Moore's Fed. Practice, ¶ 23.071[1] at 23-185 (1972). No conflict exists between the plaintiff and the class members in this case.  TLC is challenging the same unlawful conduct and seeking the same relief as the remainder of the proposed Class.   There are no conflicts of interest, nor any reason to believe that conflict will arise between the representative plaintiffs and other class members regarding the challenge to defendant's promulgation of the two cost limits. The named plaintiff shares with the class a common interest in vindicating their rights.  As for

class counsel, the lawyers with the law firm Feldesman Tucker Leifer Fidell LLP have substantial experience in representing and working with FQHCs. Counsel is not aware of any other law firm that matches or exceeds their level of experience in litigating issues relative to FQHC rights.

**D.      The Proposed Class Qualifies Under Rule 23(b)(2)**

Rule 23(b)(2) permits an action to be maintained as a class action where plaintiffs establish that (1) the complaint seeks relief that is predominantly injunctive or declaratory; and (2) the defendant "acted or refused to act on grounds generally applicable to the class." Rule 23(b)(2). As the prayer for relief in the Complaint shows, the class easily satisfies the language of Rule 23(b)(2). Plaintiffs seek primarily declaratory and injunctive relief. Accordingly, this case is highly suited for treatment under Rule 23(b)(2).

**E.      The Proposed Class Qualifies Under Rule 23(b)(3)**

Certification of a Rule 23(b)(3) class requires the Court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). The second criterion of Rule 23(b)(3), "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" also is satisfied. Factors pertinent to this evaluation include the interest of class members in litigating their claims in separate actions; litigation already commenced; the desirability of concentrating the litigation in the particular forum and any difficulties in managing the class action that might arise. Rule 23(b)(3) Given the predominance of common issues, resolution of these issues in one consolidated class action is superior to scores of individual regulatory challenges. Such challenges would require each class member to pursue its

claim individually, entail needless duplication, waste the resources of both the parties and the Court, and risk inconsistent adjudications.

All of the claims should be tried in this forum. Concentration in one forum is desirable to avoid multiple regulatory challenges. As a matter of fairness, rulings on the challenge to the lawfulness of the regulations at issue here should be the same for all class members. Class treatment is particularly appropriate many members of the plaintiff class would not be in a position to institute and litigate fully individual actions to redress the defendant's challenged actions.

Based on the foregoing, the proposed Class meets the requirements of Rule 23(b)(3) because common issues of law and fact predominate and a class action is the superior method of adjudicating this controversy. Accordingly, the proposed Class should be approved pursuant to Rule 23(b)(3) if certification is not granted under Rule 23(b)(1).


**F.    Facilitation of Notice is Appropriate**

If the Court certifies this action under Rule 23(b)(3) as plaintiffs have requested, this will trigger the notice requirement set out in Rule 23(c)(2). That rule instructs courts to "direct to the members of the [23(b)(3)] class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Rule 23(c)(2). Accordingly, plaintiffs request the Court to order the defendant to provide plaintiffs with data necessary to determine a method for achieving the best notice practicable. Once the plaintiffs have evaluated the data, they will submit a proposed notice and proposed method of delivering notice for approval by the Court.

The class action procedure is subject to the requirements of due process because it has a

*res judicata* effect on the members of the class. *Mullane v Central Hanover Bank & Trust Co.*,

339 U.S. 306, 314 (1950). Rule 23(b)(3) directs the court to include certain specific content in a

notice to a Rule 23(b)(3) class:

> The notice shall advise each member that (A) the court will exclude the member
> from the class if the member so requests by a specified date; (B) the judgment,
> whether favorable or not, will include all members who do not request exclusion;
> and (C) any member who does not request exclusion may, if the member desires,
> enter an appearance through counsel.

Fed. R. Civ. P. 23(c). Finally,

> [i]n exercising the discretionary authority to oversee the notice-giving process,
> courts must be scrupulous to respect judicial neutrality. To that end, trial courts
> must take care to avoid even the appearance of judicial endorsement of the merits
> of the action.

*Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 174 (1989).

Plaintiffs intend to provide a notice to the class members that meets the requirements of

due process and Rule 23 by providing information about the pendency of the action, the nature of

the claims and the steps the class members must take to "opt out" of the Rule 23(b)(3) counts. It

will contain the explicit content mandated by Rule 23(b)(3). While the deadlines for the

response to the Notice have not yet been determined, plaintiffs will ask the Court to set those

deadlines once it is appropriate to do given the current briefing schedule in the case. The

purpose of the Notice will be to allow class members to make an independent, informed decision

about whether and how to participate in the lawsuit and to understand the consequences of their

choices.

Because all of the proposed class members are current HRSA grantees or other entities

deemed eligible by HRSA for FQHC status as look-alikes under Section 330 of the Public Health

Service Act, HRSA should provide the data necessary to identify them. Besides identifying class members, data from HRSA will also provide a basis for plaintiffs to determine and propose to the Court the best practicable method of notice. Generally, if reasonably recent addresses are available, delivery by first class mail to a last known address is the preferred method of giving notice. Electronic posting of the notice on the HRSA/BPHC website may supplement mail efforts. After plaintiffs have evaluated the usefulness of the available data and the potential location of class members, they will be able to make a more informed proposal to the Court about what method of delivering Notice will best meet the demands of due process and Rule 23.

The Court has the authority to order defendant to produce the data pursuant to Rule 23(d)(2) and (5) which provides that the Court may make appropriate orders directing the manner of providing notice and dealing with any other procedural matters.

## CONCLUSION

For all the reasons set forth above, this Court should grant the motion for certification of a class consisting of all current and future FQHCs that participate in the Medicare program. Plaintiffs respectfully request the Court to grant plaintiffs' motion to certify the class and to authorize notice to the class using the form and method which has been partially proposed and should be further developed once additional information from HRSA is received.

Respectfully submitted,

September 7, 2007

_____

James L. Feldesman (D.C. Bar No. 023796)
Kathy S. Ghiladi (D.C. Bar No. 435484)
Feldesman Tucker Leifer Fidell LLP
2001 L Street, N.W., Second Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
*Attorneys for Plaintiff*

12