**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THREE LOWER COUNTIES COMMUNITY HEALTH | ) | |
| SERVICES, INC., *et al*., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00844 |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN | ) | |
| SERVICES, *et al.,* | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**I.  INTRODUCTION**

Plaintiff, Three Lower Counties Community Services, Inc. ("TLC"), hereby submits its

Opposition to Defendant's August 8, 2007 Motion to Dismiss (the "Motion").  Defendants

(hereinafter "HHS") rely principally on *Shalala v. Illinois Council on Long Term Care, Inc.,* 529

U.S. 1, 23 (2000) ("*Illinois Council*") for their argument that this Court lacks jurisdiction

because TLC (somehow) has failed to exhaust its administrative remedies.

TLC, and the patients and communities its serves, would have been entitled to judicial

review to challenge the two Medicare cost limits at issue in this case without having to "channel"

TLC's regulatory challenge in the manner discussed in *Illinois Council.*  Regardless, whatever

*Illinois Council* may have required TLC to do in the way of channeling, it did.  And, whatever

the aims of such channeling may be, as expressed in *Illinois Council*, they have been met.  The

only conceivable purpose of HHS' dismissal motion is to frustrate a regulatory challenge, not

fulfill a statutory goal.  TLC is entitled to be in this Court to advance its arguments in this case.

## II. ARGUMENT

**A.    The Provisions of 42 U.S.C. § 405(h) and § 1395ii**

As set forth in TLC's Complaint, this case is concerned with HHS' rulemakings regarding Federally-qualified health centers ("FQHCs") in the Medicare program. Those rulemakings produced the two cost limits at issue in this case. In imposing those limits, HHS ignored facts that it was required to consider, made false assertions and false promises of later actions and wound up with unlawful limits on reimbursing the costs these FQHCs incur in treating Medicare patients.

HHS contends (at 18-19) that 42 U.S.C. § 405(h) and § 1395ii require TLC to "exhaust" as respects its legal arguments against those limits. Section 405(h) arises within the Social Security Act and is made applicable to the Medicare statute by 42 U.S.C. § 1395ii. The only statutory process to which § 405(h) (*via* cases such as *Illinois Council*) could attach in the circumstances here presented is found at 42 U.S.C. § 1395oo. This process in bold strokes allows "providers" of care to Medicare beneficiaries to seek more money for their services than an HHS fiscal intermediary determines they are owed. The end point of the process this section offers is a hearing before and decision by HHS' Provider Reimbursement Review Board ("PRRB").

The first hurdle for a PRRB hearing is described in subsection (a):

> Any provider of services which has filed a required cost report within the time specified in regulations may obtain a hearing with respect to such cost report by a Provider Reimbursement Review Board . . .

That a provider may actually obtain a PRRB hearing is conditioned on further jumps. The key one requires that:

> (1) Such provider—
>
> (A)(i) is dissatisfied with a final determination of the organization serving as its fiscal intermediary . . . as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for the period covered by such report, or
> (ii) is dissatisfied with a final determination of the Secretary as to the amount of the payment . . . ;

42 U.S.C. § 1395oo(a)(1)(A).[1]

Although TLC in the past has exceeded one or both of the two cost limits being contested in this case, at the time it initiated its agency "appeal" of the two limits -- with a communication to its fiscal intermediary (Compl. ¶ 4) -- it had not determined whether either of the limits would impinge on its current year's reimbursement.  Nonetheless, TLC's circumstances were such that it most definitely faced the prospect of those limits "biting" in the near future.

As such, TLC was not "dissatisfied with a final determination" from its intermediary, only with the certain outcome of what would happen in the future if, as it expected, it exceeded one or both limits.  There was, moreover, no future point that TLC could predict when it would be "dissatisfied" because the limits then bit into TLC's reimbursement.  Waiting for the cost report that reflected the occurrence of that point might take a year or two, or more.

What exists here is exactly the situation that confronted the Supreme Court in *Heckler v. Ringer*, 466 U.S. 602 (1984), and is in *Illinois Council's* discussion at 529 U.S. 12, when it quoted *Ringer,* in emphasizing that even "a 'claim for future benefits' [the language of *Ringer*] is

---

[1] A provider may also obtain a hearing if the intermediary has not provided a final determination on a timely basis.  *Id*. at (a)(1)(B).

a § *405(h)* claim…, and that 'all aspects' [again from *Ringer*] of any such…future claim must be

'channeled' through the administrative process" (citations to *Ringer* and other cases omitted).

TLC fits the *Ringer* model to a tee except that unlike Mr. Ringer, TLC tried to exhaust the

administrative process.  Well before it filed its Complaint in this Court, TLC addressed a letter to

its fiscal intermediary seeking review but questioning whether the intermediary could grant it.

Later, when it had become clear that the intermediary would not respond, TLC wrote to the

PRRB asking for: (1) a ruling on jurisdiction pursuant to 42 U.S.C. § 1395oo(f)(1), and (2)

expedited judicial review ("EJR") pursuant to 42 C.F.R. § 405.1842.  *See* Ex. A to Defendant's

Motion, October 10, 2006 letter from TLC to the PRRB.  In making its requests, TLC explained

that it sought a ruling as to whether the PRRB had the authority to address challenges to two

limits on Medicare FQHC reimbursement -- the Medicare cap (which prevented FQHC per visit

reimbursement from exceeding previously set per visit limits) and the productivity screen (which

required yearly average aggregate visits per doctor and other licensed health care providers

eligible to provide Medicare visits to be at or above certain levels and adjusted costs claimed for

such visits by the percentage the FQHC's aggregate average failed to meet those levels – *e.g.*, if

the FQHC's doctors' average were 20 percent lower than the required productivity level the

doctors' costs the FQHC claimed were reduced 20 percent (by an automatic adjustment built into

the cost report).  Ex. A at 1.  TLC even explained the reasons why it did not believe that the

PRRB had jurisdiction over these challenges (Ex. A at 1-2).

> Our understanding that the PRRB would have no jurisdiction to
> entertain such a challenge presumes that the PRRB would be
> unable to provide appropriate relief in the circumstances; namely, a
> finding that the limits are unlawful under APA [Administrative
> Procedure Act] standards, and an order that would enjoin their
> further use and require corrective action to the extent the limits
> have adversely affected Medicare payments to FQHCs.

Notwithstanding its position, however, TLC requested that "in the event that the PRRB determines otherwise. . .we ask the PRRB immediately to place the challenges on its appeal docket." *Id*. at 1-2.

According to the EJR procedures set forth in 42 C.F.R. § 405.1842, the PRRB had thirty days in which to respond to TLC's request. The PRRB received TLC's request on October 10, 2006. Ex. A to Def.'s Motion at 1 (receipt stamp of 10/10/06). On November 9, 2006, the Chair of the PRRB sent a letter to TLC's counsel (attached as Ex. B to Def.'s Motion), stating that "[t]his letter is to advise you that the Board does not furnish advisory opinions on jurisdiction. The only jurisdictional rulings issued by the Board involve cases pending before it." Ex. B to Def.'s Motion, November 9, 2006 letter from S. Cochran.

The response of the PRRB Chair placed TLC in exactly the perplexing situation the Court, in *Illinois Council*, suggested *Michigan Academy* fixed; namely, that if TLC could not obtain "review through the agency" (529 U.S. at 18), something the PRRB Chair's response made clear was the case, § 1395ii (through which §§ 405(h) and 405(g) attach to Medicare "claims") simply would "not apply." *Id*.

Despite the thirty day clock and the Chair's response, the PRRB took subsequent action. Well after the PRRB Chair's letter, on January 4, 2007, the Board sent counsel for TLC a notice as to "Acknowledgement and Critical Due Dates," Ex D to Def.'s Motion, which assigned a case number, indicating that the case had been filed on October 10, 2006. On January 14, 2007, TLC sent a letter to the author of the notice explaining that it contradicted the earlier, November 9, 2006, letter from the PRRB's Board Chair. Ex B at 1. Once again, TLC explained why the PRRB process did not "fit".

Three months later (on April 20, 2007), the PRRB sent yet another letter to TLC's counsel setting forth "[t]he Board's jurisdictional determination."  Ex F to Def.'s Motion at 1. This time, in an obvious exercise of *post hoc* argument buttressing, the Chair of the Board advised:

> In this case, the Provider has not identified a final determination, the fiscal year end, or the amount in controversy for the issues it seeks to appeal as required by the statute and regulation for Board jurisdiction.  Consequently, the Board lacks jurisdiction over the appeal."  Ex. F at 2.

The Chair's about-face on her statement that "the board [did] not furnish advisory opinions on jurisdiction" left TLC in the same "soup" her earlier communication had placed it in -- if § 1395ii applied, TLC could obtain no review, the very circumstance the *Illinois Council* Court held that *Michigan Academy* protected against.

Thus, TLC attempted to extract an answer from the PRRB pursuant to its own regulations.  The Board's initial response, while cryptic, made sense.  However, its subsequent responses reveal that the PRRB was not capable of addressing the question presented head-on. As for HHS itself, it has had a chance - - since 1996 when it completed the promulgation of the rulemaking at issue here - - to keep its regulatory promise of reviewing actual FQHC costs. Complaint ¶¶ 45-46, 49.  Even after the association representing health centers presented its study to HHS (Complaint ¶¶ 52-54), the agency took no action in response to the information it received.  The doctrine of exhaustion is not a rigid requirement to be applied inflexibly.  *McKart v. United States*, 395 U.S. 185, 89 S. Ct. 1657, 23 L. Ed 2d 194 (1969).  To send TLC back to the PRRB would be an exercise in futility.  The benefit of "channeling" matters such as regulatory challenges that could not be remedied by agency process described in *Illinois Council* and predecessor cases are, more or less, a chance for the agency to reconsider its regulations.  *See,*

*e.g., Weinberger v. Salfi*, 422 U.S.749, 765, 45 L. Ed 2d 522, 95 S. Ct. 2457 (1975), (purpose of

exhaustion doctrine was to "prevent premature interference with agency processes" and to give

the agency a chance to "compile a record which is adequate for judicial review.").  That chance

has been more than provided in the circumstances of this case.

**B.    The Unique Legal Nature Of FQHCs Fits Them Into Exceptions Acknowledged In**
       ***Illinois Council* And Prior Cases And Even Places Them Outside the Boundaries Of**
       **The Exhaustion Requirement**

       **1.    <u>Uniqueness Of FQHCs</u>**

       TLC's substantive argument in this case is rooted in the failing of HHS' Centers for

Medicare and Medicaid Services ("CMS") to take account of the unique character of FQHCs.

HHS' argument in favor of dismissal repeats this failing.  To illustrate this failing, we need to

explain that unique character and its implications.

       That explanation relies in part on Section 330 of the Public Health Service ("PHS") Act,

42 U.S.C. § 254b and accompanying regulations at 42 C.F.R. §§ 51c.101-51c.507.  As a starting

point to what Section 330 provides, we begin with the fact that grants to "health centers"

(defined in § 254b(a)) must be limited to those "centers that provide health services to medically

underserved populations".  § 254b(e)(1)(A).  As defined in the regulations, at § 51c.102(e):

> *Medically underserved population* means the population of an
> urban or rural area designated by the Secretary as an area with a
> shortage of personal health services or a population group
> designated by the Secretary as having a shortage of such services.
> Medically underserved areas will be designated by the Secretary
> and a list of those designated will be published in *Federal Register*
> from time to time, taking into consideration the following factors,
> among others:
>
> (1)  Available health resources in relation to size of the area and its
>      populations, including appropriate ratios of primary care
>      physicians in general or family practice, internal medicine,
>      pediatrics, or obstetrics and gynecology to population;

    (2)  Health indices for the population of the area, such as infant
          mortality rate;

    (3)  Economic factors affecting the population's access to health
          services, such as percentage of the population with incomes
          below the poverty level; and

    (4)  Demographic factors affecting the population's need and
          demand for health services, such as percentage of the
          population age 65 and over.

Accordingly, the populations health centers serve and the areas within which the centers are located are, to put it simply, starved for doctors and other health care providers because their populations are too poor to attract an adequate complement of those providers. The purpose of the Section 330 grant is to alleviate the shortage. As such, Section 330 centers must serve all residents of its community, regardless of any resident's/patient's ability to pay. 42 U.S.C. §§ 254b(a)(1) and 254b(i)(3)(G). As explained in 42 C.F.R. § 51c.303(f) health centers must:

> Have prepared a schedule of fees or payments for the provision of its services designed to cover its reasonable costs of operation and a corresponding schedule of discounts adjusted on the basis of the patient's ability to pay. *Provided*, That such schedule of discounts shall provide for a full discount to individuals and families with annual incomes at or below those set forth in the most recent CSA Poverty Income Guidelines (45 CFR 1060.2) and for no discount to individuals and families with annual incomes greater than twice those set forth in such Guidelines, except that nominal fees for services may be collected from individuals with annual incomes at or below such levels were imposition of such fees is consistent with project goals

Section 330 centers also must have a Board of Directors, a majority of whom are "individuals who are or will be served by the center and who, as a group, represent the individuals being or to be served… 42 C.F.R. § 51c,304(b). Among the Board's specific duties is to assure that the center is operating in compliance with applicable Federal…laws and regulations…" *Id*. at 51c.304(v).

Section 330 centers are required to participate in the Medicaid and Medicare programs.

§ 254b(k)(3)(E). Their use of revenue derived from that participation is strictly limited to actions

permitted with Section 330 grant funds or that "benefit the objectives of the [Section 330]

project". 42 U.S.C. § 254b(e)(5)(D). Section 330's other requirements *vis-à-vis* such

participation include:

> …mak[ing]…and…continu[ing] to make *every reasonable effort* to collect appropriate reimbursement for its costs in providing health services to persons who are [among others, Medicaid and Medicare beneficiaries]."

42 U.S.C. § 254b(k)(3)(F) (emphasis added). In this regard, the same full fee and schedule of

discounts to poor patients become relevant. It is those full fees the center must charge to

Medicare and Medicaid under § 254b(k)(3)(G)(i). The center must "make every reasonable

effort…(II) to collect reimbursement for health services to [among others, Medicaid and

Medicare beneficiaries] on the basis of the full amount of fees and payments for such services

without application of any discount…" The logical question that is what do those two programs

do in the way of paying the centers?

For the last seventeen years, these programs have been statutorily required to pay those

full fees. The FQHC Medi*care* legislation containing this requirement was enacted in 1990 and

was preceded by the enactment of FQHC Medi*caid* legislation in 1989 -- under the 1989

Omnibus Budget Reconciliation Act. Pub. L. No. 101-239. *See* 42 U.S.C. § 1396(a)(2)(C) (and

related sections of the Medicaid statute, Title XIX of the Social Security Act). That earlier

enactment (which is cross referenced to and relies on the Medicare FQHC provisions for (among

other things) payment methodology (*see*, 42 U.S.C. § 1396a(bb)(2)) was Congress' first step in

directly connecting Section 330's requirement of collection of reasonable costs associated with

serving Medicare and Medicaid patients with the Medicare and Medicaid laws.

That connection resulted in Section 330 centers becoming entitled to such reasonable cost payment under both programs.  Congress' device was legislation that created Federally-qualified health centers ("FQHCs") (Section 330 centers and a few "look-alikes") as a category of service provider.  The reasonable costs requirements are (now) required under 42 U.S.C. § 1395l(a)(3) (Medicare) and 42 U.S.C. § 1396a(bb)[2] (Medicaid).  Congress could not have been clearer in explaining its reasons for reasonable cost reimbursement in its 1989 amendment to the Medicaid statute.

> The Subcommittee on Health and Environment heard testimony that, on average, Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients.  The role of [health centers] . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*
>
> * * *
>
> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services (Emphasis added.)

H.R. Rep. No. 101-247, at 392-3, *reprinted in* 1989 U.S.C.C.A.N. 2118-9.

The enactment of FQHC provisions in the Medicare and Medicaid laws did not only command the part of HHS responsible for those laws to pay health centers the sums Section 330 commands health centers to "make every reasonable effort…to collect."  It made FQHC services

---

[2] The original Medicaid legislation required "reasonable costs".  The current version, enacted in December 2000, requires payment based on reasonable costs.

a *right* for Medicare and Medicaid beneficiaries.  In the case of Medicare, "[t]he benefits provided to [a Part B beneficiary] shall consist of -- …Federally-qualified health center services…"  42 U.S.C. § 1395k(a)(7)(D).  Regarding Medicaid, the FQHC benefit right exists under 42 U.S.C. § 1396d(a)(2)(C).  There is, as previously noted, a similar "right" in Section 330 to health center services for all persons within the areas or populations a center covers under various requirements in Section 330, including § 330(k)(3) (42 U.S.C. § 254b(k)(3)).

In making FQHC services a patient right, Medicare and Medicaid beneficiaries also became entitled to the other benefits Section 330 centers offer.  Centers' discounted fee structure could pay or help pay a Medicare recipient's share of the cost of a visit.  Medicare beneficiaries also were provided special services from FQHCs -- Section 330 "preventive primary health services" (42 U.S.C. § 1395x(aa)(3)(B)).  Other center services provided with Section 330 funds, such as case management, transportation and translation, patient education (all at Section 330(b)(iii)(iv) and (v)) and provision of information on health plans for which a patient may be eligible (at Section 330(k)(3)(M)) also became available.

The health center benefits to which Medicare patients are entitled even include eligibility to purchase inexpensive prescription drug products.  Under the authority of 42 U.S.C. § 256b(a)(4)(A), centers have access to such discounted drugs, which they can sell at lower cost to Medicare patients in their pharmacies, a service authorized under Section 330(b)(1)(i)(V), or *via* contracts with outside pharmacies.

The foregoing description of Section 330 health center services, rights, entitlements, benefits, *etc.* leads to several conclusions relevant to the question of whether this case must now be dismissed for want of jurisdiction.  They are (in no order of importance):

(1)    Health center services are a Medicare patient's right.

(2)    The services and benefits they provide to Medicare and other patients are unique and far more extensive than any other comparable provider.

(3)    The community or communities served by the center would lack access to adequate care if the center were no longer there.

(4)    If Medicare or Medicaid pays less than its fair share of center costs in treating one of its beneficiaries, harm befalls other persons in the center's community eligible for those programs who would benefit from center services but because of revenue shortfalls never receive them.[3]

(5)    More than that, if Medicare or Medicaid pays less than its fair share of center costs, persons other than their beneficiaries who are otherwise eligible for and would benefit from center services do not receive them.

(6)    The direct connection between payment by Medicare and Medicaid of their fair shares and availability of center services to persons not eligible for either program was found by the United States Congress.

(7)    Centers are required to take every reasonable step to recover what Medicare and Medicaid law entitles them to receive.  In this respect, they are effectively deputized by Congress to make certain that the result of Medicare or Medicaid paying less than its fair share that Congress foresaw – the reduction of care to others for whom the Section 330 grant was made – would not take place.

---

[3] As explained in TLC's complaint, centers are not well-known and unless their services are "marketed," many people never even learn they are available.  TLC and other centers are able to limit (or attempt to limit) the number of persons seeking their services to a number they have the means to serve essentially by keeping mum.  *See* Compl. at 59-61.

(8)    Centers uniquely represent their communities' interests not only because their

       presence is essential to the provision of adequate care but also because their

       Boards are formed and structured with such representation in mind.  Moreover,

       many persons who do not receive center services because of Medicare or

       Medicaid payment shortfalls do not even know, nor could they, that they are

       victims of such deprivation.  If centers do not undertake to represent their

       interests, no one else, including such persons, will.

(9)    The lack of health center care that arises whenever Medicare or Medicaid fails to

       pay its fair share is not only a continuing harm but one that will not and cannot be

       remedied by later relief in the form of payments being made that should have

       been made all along.  Whoever has not been served and should have been will

       suffer the consequences.

Thus, TLC attempted to extract an answer from the PRRB pursuant to its own

regulations.  The Board's initial response, while cryptic, made sense.  However, its subsequent

responses reveal that the PRRB was not capable of addressing the question presented head-on.

As for HHS itself, it has had a chance - - since 1996 when it completed the promulgation of the

rulemaking at issue here - - to keep its regulatory promise of reviewing actual FQHC costs.

Complaint ¶¶ 45-46, 49.  Even after the association representing health centers presented its

study to HHS (Complaint ¶¶ 52-54), the agency took no action in response to the information it

received.  The doctrine of exhaustion is not a rigid requirement to be applied inflexibly.  *McKart

v. United States*, 395 U.S. 185, 89 S. Ct. 1657, 23 L. Ed 2d 194 (1969).  To send TLC back to the

PRRB would be an exercise in futility.  The benefit of "channeling" matters such as regulatory

challenges that could not be remedied by agency process described in *Illinois Council* and

predecessor cases are, more or less, a chance for the agency to reconsider its regulations.  *See, e.g., Weinberger v. Salfi*, 422 U.S.749, 765, 45 L. Ed 2d 522, 95 S. Ct. 2457 (1975), (purpose of exhaustion doctrine was to "prevent premature interference with agency processes" and to give the agency a chance to "compile a record which is adequate for judicial review.").  That chance has been more than provided in the circumstances of this case.

C.    **Section 405(h) is Inapplicable Where Judicial Review Would Effectively Be Denied And Where The Potential Harm and Penalties Incurred Are Not "Minor"**

The above discussions of health centers and what their authority and benefits mean in terms of the issues here are directly related to a line of decisions by this District Court.  In *American Lithotripsy Society v. Thompson*, 215 F.Supp. 2d 23 (D.D.C. 2002), for example, the Court was faced with the plaintiff physicians' (through their association) challenge to certain Medicare regulations restricting their ability to prescribe lithotripsy.  To follow the relevant exhaustion process (*i.e.*, violate the challenged rule, incur a penalty, and then exhaust administrative remedies) would have resulted in the plaintiffs facing monumental fines as well as potential criminal liability under Stark regulations.  Using the framework set forth in *Illinois Council*, the Court concluded that the administrative process was sufficiently onerous to constitute the "practical equivalent of a total denial of judicial review."  *American Lithotripsy*, 215 F. Supp. 2d at 29.  The administrative review option was held to offer no realistic opportunity for judicial review:

> Under Illinois Council then, the relevant question is whether applying 405(h) in the instant case would have the practical effect of denying plaintiffs judicial review.  Plaintiffs argue persuasively that it would, particularly in light of the factors identified in Illinois Council as probative: the severity of the penalty incurred by a violation and the ability of plaintiffs' members to have access to administrative review.

*Id*. The Court found that the potential penalties in the case before it were "far more serious than those before the Court in *Illinois Council* and can hardly be described as 'minor'" *Id*. As a result, the Court refused to apply section 405(h).

The *American Lithotripsy* Court also observed that genuine access to agency review was another factor to be considered under the *Illinois Council* framework. In so holding the Court explained:

> This lack of representation in the agency review process presents an even bigger stumbling block to the plaintiffs in the present case, because enrollees will receive lithotripsy treatment from an urologist regardless of how the regulations divide lithotripsy technical fees between the urologist and the hospital. Thus, enrollees have no incentive to challenge the regulations. Moreover, in contrast to the plaintiffs in *Illinois Council* and in both of the D.C. district court cases, in this case the plaintiffs' members do not themselves have standing to challenge the regulations before the agency, because they are not considered 'providers' under the Medicare statute.

*Id.* at 29-30.

As in *American Lithotripsy,* there is no way for health center patients who are harmed by these Medicare cost limits to challenge those limits through the administrative process. As this Court has found, palpable injury can stem from a denial of an opportunity. In *West Virginia Association of Community Health Centers, Inc. v. Heckler*, 734 F. 2d 1570 (D.C. Cir. 1984), the Court recognized that the denial of a grantee's opportunity to apply for extra grant funds conferred standing on the plaintiff association that represented these potential grantees. *Id*. at 8, n. 5. Here, there is denial of required and unique health center services, an equal, if not far more severe harm. There is also at least as compelling argument for TLC's standing to represent the interests of those suffering the harm. The above discussion of health centers' unique duties and

responsibilities toward its patients and communities to represent their interests underscores that argument.

In another case, N*ational Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 38 n. 4 (D.D.C. 2000), including termination from the Medicare program, were described as "draconian" and "economic suicide."  As a result, the Court found that "[u]nlike the nursing homes in *Illinois Council*, Plaintiff's members, as a practical matter, do not have the option of incurring a minor penalty and receiving an administrative hearing before proceeding to court." *Id*. at 39.  For that reason, "[a]pplication of § 405(h) would amount to the 'practical equivalent of a total denial of judicial review' because 'what appears to be a channeling requirement [turns] into complete preclusion of judicial review."  *Id*.  Again, in TLC's case the harm to individuals' health is at least as "draconian."

*American Chiropractic Ass'n v. Shalala*, 131 F. Supp. 2d 174 (D.D.C. 2001) was another post-*Illinois Council* challenge to Medicare regulations.  While the Court dismissed certain claims as barred by section 405(h), it held that jurisdiction could be exercised as to the claims that the regulations precluded.  The Court approached its analysis focusing on the issue of the plaintiffs' genuine access to administrative review channels.  *Id*. at 177.  It found that the plaintiff chiropractors could obtain administrative review only by acting as the fiduciary of their patients. *Id*.  Their patients (beneficiaries of the Medicare program), however, lacked any incentive to pursue their doctors' interest in challenging the agency's regulations permitting non-chiropractors to provide a particular treatment to the Medicare enrollees because the patients would care mostly about receiving treatment, not who was provided it.  *Id*.  The reverse is true here, but the underlying logic is the same.  If the patients (or persons who might become patients) are being deprived, their access to the administrative process is non-existent.

TLC is before the Court not just as, using the parlance of *American Chiropractic Ass'n*, "fiduciary"[4] to the patients it currently serves, but also brings this case to prevent the deprivation of rights to health care of *potential* patients caused by the two cost limits at issue in this case. Just as these current and prospective patients would have standing to challenge their deprivation of health care by suffering the "injury in fact" requirement of *Warth v. Seldin*, 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975) [5], TLC's standing here is co-extensive with that of its patients and the potential patients in its community -- a community that has already been determined to be "medically underserved" by HHS.

This leads us to our final reason for why this Court has jurisdiction of this case as it stands. In the 1989 and 1990 FQHC legislation, Congress wound together the Medicare, Medicaid and Section 330 programs. It required payments at rates centers were bound to obtain. It made services of centers a right under all these programs. Most importantly for the purposes here, it connected the consequence of a failure of Medicaid or Medicare to pay the health centers their costs of services to those programs' beneficiaries with the harm that would befall others in the health centers population who were not in Medicaid, or Medicare.

In so doing, Congress determined that injury in fact would be caused to a health center's actual or prospective patients whose care was or would be supported by Section 330 (not another

---

[4] See *Rust v. Sullivan* , 500 U.S. 173 (1991) (health care provider's ability to bring an action on a patient's behalf to vindicate a right of the patient's).

[5] Should it be necessary, this Court has the ability to look "beyond the pleadings" in assessing whether the elements of standing have been met. *Phoenix Consulting, Inc. v. Republic of Angl.,* 216 F.3d 36, 40 (D.C.Cir.2000); *Thompson,* 120 F.Supp.2d at 81-82 (citation omitted); *Uberoi v. EEOC,* 180 F.Supp.2d 42, 44 (D.D.C.2001) (citation omitted). Thus, " ' [t]he court may consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction in the case.' " *Uberoi,* 180 F.Supp.2d at 44 (alteration in original) (quoting *Scolaro v. D.C. Bd. of Elections and Ethics,* 104 F.Supp.2d 18, 22 (D.D.C. 2000)).

federal program) whenever Medicaid, or Medicare, paid less than its share for the center's services to its beneficiaries.  It is not and cannot therefore be accurately stated that TLC's legal claim against the two Medicare payment limits is one that derives -- as repeated by *Illinois Council* in citing precedent on which it relied (529 U.S. at 11 (referring to *Weinberger v. Salfi* and 12 (referring to *Heckler v. Ringer*'s quotation of *Salfi*) -- its "standing and substantive basis for the presentation" of its claim wholly from the Medicare Act.  To hold that it did would be to deny Congress' explicit connection of harm to non-Medicaid, or Medicare, patients, actual and prospective and its legislation designed to prevent that harm, which TLC here challenges.

### III.  CONCLUSION

Whether it is the *Michigan Academy* exception, the sufficient exhaustion of remedies to accomplish the "channeling" requirement's purpose, the district court cases finding substantial harm (and more) and basing jurisdiction thereon, or the tying together the harm caused by the Medicaid or Medicare program's failure to pay a center what it should to non-Medicaid/Medicare patients, TLC is properly before this Court.  The Court should now turn its attention to the substantive case TLC will present and decide whether that case warrants the relief TLC seeks.

Date:  September 10, 2007                    Respectfully submitted,


                                             /s/ James L. Feldesman
                                             James L. Feldesman (D.C. Bar No. 023796)
                                             Kathy S. Ghiladi (D.C. Bar No. 435484)
                                             Feldesman Tucker Leifer Fidell LLP
                                             2001 L Street, N.W., Second Floor
                                             Washington, D.C.  20036
                                             (202) 466-8960 (telephone)
                                             (202) 293-8103 (facsimile)

                                             *Attorneys for Plaintiff*