**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THREE LOWER COUNTIES COMMUNITY HEALTH SERVICES, INC., *et al.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00844 |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.,* | ) ) ) | |
| *Defendants.* | ) ) | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION AND SUPPORTING**
**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Plaintiff, Three Lower Counties Community Services, Inc. ("TLC"), hereby moves for

reconsideration of the Court's Order and Memorandum Opinion dated October 9, 2007 granting

the defendants' motion to dismiss.

## II. BASES FOR RECONSIDERATION

A. **Plaintiff Sought Expedited Judicial Review from the PRRB and Did Not Need to**
   **Claim Dissatisfaction through the Mechanism of a Cost Report**

The Court's Memorandum Opinion (at 6, n.4) noted that the PRRB has an "expedited

judicial review" process available under 42 U.S.C. § 1395oo(f)(1), presumably because the Court

was of the mind that plaintiff TLC could and should have attempted to utilize that process.  In

fact, TLC did attempt to use this process by submitting a formal, written request for expedited

judicial review (in October 2006) referencing the applicable statutory provision (§ 1395oo(f)(1)).

Ex.  A to Defs. Motion to Dismiss.  The cases cited in the Memorandum Opinion (at 6-7)

involving actions as trivial as a plaintiff's phone calls to a helpline (*Masey v. Humana, Inc.*, 2007 WL 2363077 at \* 10 (M.D. Fla. Aug. 16, 2007)) and a "letter writing campaign" (*Cardiac Monitoring Srvs., Inc. v. Blue Cross Blue Shield*, 807 F. Supp. 1422, 1427 (E.D. Ark. 1992)) are not what TLC did here. TLC did not attempt to "circumvent the Medicare appeals process" (Memorandum Opinion at 6), but instead sought to exhaust that process by (among other steps it took) utilizing the expedited decision procedure under § 1395oo(f)(1). The reason this case was filed is that HHS rebuffed plaintiffs' effort to use that expedited decision procedure.

The Supreme Court's decision in *Bethesda Hosp. Ass'n v. Bowen*, 485 U.S., 399, 108 S. Ct. 1255 (1988), demonstrates why plaintiff TLC is effectively shut off from PRRB review under any set of circumstances in regard to the two legal issues presented in this case and why HHS' rationale for rebuffing TLC's efforts to exhaust the administrative process is a "*trap*" from which TLC cannot escape without judicial intervention. In *Bethesda Hosp.*, Medicare providers brought an action challenging the validity of administrative regulations governing the reimbursement of malpractice insurance costs. As with the FQHCs' Medicare cost reports, those providers "self-disallowed" the malpractice insurance costs in question because their costs reports were structured to automatically exclude the forbidden costs -- just like the FQHCs' cost reports (*see* Complaint at ¶ 41). 108 S. Ct. at 1257. As a result, those providers' cost reports did not and would not reflect any "dissatisfaction" with a final determination by the fiscal intermediary because the intermediary was not involved in eliminating those costs from the providers' claimed (on the cost report) amount. *Id.*

In *Bethesda Hosp.*, HHS had argued that "a provider's right to a hearing before the Board extend[ed] only to claims presented to a fiscal intermediary because the provider cannot be 'dissatisfied' with the intermediary's decision to award the amounts requested in the provider's

2

cost report." *Id*. at 1258.  In other words, HHS argued that the providers had no right to PRRB

review and no right to sue in court.  Understandably, the providers in *Bethesda Hosp*. had

bypassed the fiscal intermediary and the PRRB going straight to federal court.  The Supreme

Court reasoned that they (the providers) knew that "under the statutory scheme, the fiscal

intermediary is confined to the mere application of the Secretary's regulations, that the

intermediary [was] without power to award reimbursement except as the regulations [provided],

and that any attempt to persuade the intermediary to do otherwise would be futile," and

emphasized that "[n]either the fiscal intermediary nor the Board ha[d] the authority to declare

regulations invalid."  108 S. Ct. at 1259.

Despite this lack of PRRB authority -- which suggests that the providers should be

allowed to bypass the HHS process -- the Supreme Court decided the case by casting a pox on

both houses.  It refused to allow the providers to bypass the PRRB, holding that the PRRB, prior

to any judicial review, "must first make a determination that it is without authority to decide the

matter because the provider's claim involves a question of law or regulations."  *Id*. at 1260.  At

the same time, the Court held that the providers could get before the PRRB and claim

"dissatisfaction, within the meaning of the statute, *without incorporating their challenge in the*

*cost reports filed with their fiscal intermediaries*."  *Id*. at 1259 (emphasis added).  In short, the

Court decided that the providers could bring their case directly to the PRRB without a cost report

in hand, and by so doing refused to allow the providers to file their federal lawsuit until they first

went to the PRRB (because the Court gave them access to the PRRB).

TLC's situation in this case is substantively identical to that of the providers in *Bethesda*

*Hosp.*  Any cost report TLC presents -- to the intermediary or the PRRB -- will reflect its self-

disallowance of costs forbidden by the two regulatory limits challenged here.  In other words,

TLC's submission of a cost report (the sole defect HHS points to in TLC's appeal to the PRRB) will not correct the "jurisdictional" failing HHS here asserts because TLC will still *not* be "dissatisfied with the intermediary's decision", the predicate (in HHS' view) to PRRB "jurisdiction". Accordingly, just as would have been the fate of the providers in *Bethesda Hosp.* had they not brought their lawsuit, PRRB review and a ticket to a federal courthouse will continue to remain as unavailable to TLC with a cost report in hand as it was to TLC without that report. HHS obviously has not changed its regulations one whit to account for the Supreme Court's holding in *Bethesda Hosp.* because if it had done so, the PRRB would have provided the expedited review TLC asked for and determined it had no jurisdiction to amend the rules TLC here contends are unlawful. [1]

What is especially galling is that TLC's efforts at exhaustion exceeded what the Supreme Court required of the providers in *Bethesda Hosp.* TLC first attempted to obtain fiscal intermediary review, then went to the PRRB and obtained the PRRB's acknowledgement that it did not have the jurisdiction to address TLC's challenges. Ex. A to Defs. Motion to Dismiss. Despite this, the PRRB continued to hold TLC hostage to the cost report requirement that was determined to be unnecessary in *Bethesda Hosp.* Simply stated, TLC did exactly what the Supreme Court prescribed in *Bethesda Hosp.* and got nowhere.

B.    **Plaintiff's Claims Under the PHS Act on Behalf of Itself and Its Patients**

The Court concluded (at 8) that TLC "cannot bypass the constraints of this process by professing to bring this suit on behalf of those eligible for, but are not receiving health center services." Doing so, the Court contended, would "permit all providers to bypass the Medicare

---

[1] On June 25, 2005, HHS' Centers for Medicare and Medicaid Services ("CMS") issued a notice of proposed rulemaking that acknowledged the Supreme Court's decision in *Bethesda Hosp. Ass'n.* 69 *Fed. Reg.* 35716, 35721-22 (June 25, 2004). This rulemaking is currently on hold.

appeals process by simply alleging that their claims are brought on behalf of the additional people who could be treated, were the provider to receive more compensation."  Mem. Op. at 8.

Not all providers are comparable to TLC, however, and this Court need not fear opening the "floodgates" by holding that TLC sufficiently exhausted administrative procedures in this case.  Section 330 Public Health Service ("PHS") Act (42 U.S.C. § 254b) health centers are unique in that they receive federal support to provide a comprehensive set of services in their communities.  Section 330 grant awards provide funding that the health centers need to support their provision of health care to the poor, uninsured and underinsured patients.  Compl. at ¶5, 12-28; Exhibit A, Poole Declaration at ¶ 18.

A Section 330 center must serve all residents of its community, regardless of any resident's/patient's ability to pay.  42 U.S.C. §§ 254b(a)(1) and 254b(i)(3)(G).  Furthermore, Congress' enactment of FQHC provisions in the Medicare and Medicaid laws made FQHC services a *right* for Medicare and Medicaid beneficiaries.  In the case of Medicare, "[t]he benefits provided to [a Part B beneficiary] shall consist of -- …Federally-qualified health center services…" 42 U.S.C. § 1395k(a)(7)(D).  Regarding Medicaid, the FQHC benefit right exists under 42 U.S.C. § 1396d(a)(2)(C).  A similar "right" is found in Section 330 as to health center services for all persons within the areas or populations a center covers under various requirements in Section 330, including § 330(k)(3) (42 U.S.C. § 254b(k)(3)).  In making FQHC services a patient right, Medicare and Medicaid beneficiaries also became entitled to the other benefits Section 330 centers offer.  (A listing of such benefits is contained in TLC's Opposition at 11-13.)  Other Section 330 requirements applicable to health centers - - set forth in TLC's Opposition Memorandum at 11-13 - - demonstrate that health centers possess features expressly designed to benefit the under- and un-insured in their communities.

5

No less than the Congress made the connection between health centers' Section 330 PHS Act funding and the Medicare and Medicaid programs when it recognized[2] that a failure of the Medicaid and/or Medicaid programs to pay their fair share for services would result in less services to the uninsured persons within the health centers' medically underserved communities.[3] This result obviously is different from what would happen with private providers who/which would pocket some or all of any additional Medicare billings.[4]  And in further contrast to private

---

[2] This recognition was clearly expressed by Congress when it explained its reasons for reasonable cost reimbursement in its 1989 amendment to the Medicaid statute:

> The Subcommittee on Health and Environment heard testimony that, on average, Medicaid payment levels to Federally funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients.  The role of [health centers] . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. *To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is comprising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.*
>
> * * *
>
> To ensure that Federal PHS Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing these services .(Emphasis added.)

H.R. Rep. No. 101-247, at 392-3, *reprinted in* 1989 U.S.C.C.A.N. 2118-9.

[3] Grants to "health centers" (as defined in 42 U.S.C. § 254b(a)) must be limited to those "centers that provide health services to medically underserved populations."  42 U.S.C. § 254b(e)(1)(A); *see also* 42 C.F.R. § 51c.102(e):

[4] In this connection, most health centers are legally required to use Medicare and other non-grant revenues only to "further[] the objectives of the [Section 330] project."  42 U.S.C. § 254b(e)(5)(D).

providers, Section 330 centers must have Boards of Directors which are required to have a

majority of "individuals who are or will be served by the center and who, as a group, represent

the individuals being or to be served.  (42 C.F.R. § 51c,304(b)).  No entity or group is better

suited to understand and to represent the interests of poor persons not receiving health center

services as a result of Medicare's unlawful penury.  Indeed, it is even arguable that Section 330

commands the action TLC here takes to challenge the rules that unlawfully limit its payments

and harm its patients (current and potential).  Section 330 requires centers to:

> …make…and…continue to make *every reasonable effort* to collect
> appropriate reimbursement for its costs in providing health services
> to persons who are [among others, Medicaid and Medicare
> beneficiaries]."

42 U.S.C. § 254b(k)(3)(F) (emphasis added).  This legal action is certainly within the bounds of

the "every reasonable effort" health centers are required to make.

For these reasons it is accurate to state that Section 330 health centers are here advancing

no separate interests in their own right -- their interests are squarely aligned with those of their

patients.  The Supreme Court in *Rust v. Sullivan*, 500 U.S. 173 (1991) recognized a health care

provider's ability to bring an action on behalf of its patients to vindicate the rights of those

patients.  The rights and injury here include those of non-Medicare (current and potential)

patients, who are not conceivably within the ambit of persons whose challenges to Medicare

rules must be exhausted under Medicare's review process.  Unlike the patients and providers

covered by the extensive case law on Medicare's exhaustion requirement, these non-Medicare

patients do not want Medicare to pay them or their providers for their services.  They instead

want Medicare to pay fully for an FQHC's care to its beneficiaries, thereby ensuring that grant

funds are available to pay for services to them.  For this reason alone, this case, to the extent filed

on those non-Medicare beneficiaries' behalf, properly belongs in this Court.

**C.**     **Exceptions to the Exhaustion Requirement Apply Here**

As the Supreme Court explained in *Weinberger v. Salfi*, 422 U.S.749, 765, 45 L. Ed 2d

522, 95 S. Ct. 2457 (1975), the purpose of Medicare's exhaustion requirement was to "prevent

premature interference with agency processes" and to give the agency a chance to "compile a

record which is adequate for judicial review."  That chance has been more than provided in the

circumstances of this case.  Whatever "review through the agency" (529 U.S. at 18) that is

attainable here was achieved by TLC's submissions to the PRRB, beginning October 10, 2006.

In *Mathews v. Eldridge*, the Supreme Court highlighted two elements that function as

prerequisite conditions to judicial review.  *Mathews v. Eldridge*, 424 U.S. 319, 328, 96 S.Ct. 893,

899 (1976). Of the two elements, one is essential, while the other is waivable.  *Id.*  The

nonwaivable element applicable here is "the requirement that a claim for benefits shall have been

presented to the Secretary."  *Id.*  In *Mathews*, the court held that the respondent fulfilled this

presentment element simply by answering an agency questionnaire and sending a letter in

response to the tentative termination of his disability benefits.  *Id.*  According to the court, "[t]he

fact that [respondent] failed to raise with the Secretary his constitutional claim to a pre-

termination hearing is not controlling."  *Id.* at 329.  TLC certainly met the presentment

requirement through its formal submissions to the fiscal intermediary and the PRRB, and its

responses to the PRRB.  The content of such correspondence is sufficient presentment because,

in them, TLC specifically asserted the unlawfulness of the limits under the APA, jurisdictional

issues under 42 U.S.C. § 1395oo(f)(1), and expedited judicial review under 42 C.F.R. § 405.1842

(Ex. A. to Defs. Motion to Dismiss).  *See Action Alliance of Senior Citizens v. Leavitt*, 483 F. 3d

852, 851 (C.A.D.C. 2007) (holding appellate did not satisfy presentment because email correspondence failed to invoke specific grounds for complaint).

The second applicable condition for judicial review "is the requirement that the administrative remedies prescribed by the Secretary be exhausted." *Mathews*, 424 U.S. at 328, 96 S.Ct. at 899. However, this element is waivable if the initial action regarding the complaint "was a sufficiently 'final' decision…to satisfy the exhaustion requirement." *Id.* at 330. A final decision is reached if the Secretary waives the exhaustion requirement due to the lack of necessity for further review (because the agency's needs are fulfilled or relief sought is beyond the scope of agency's power). *Id.* However, a second rationale for waiver applies "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate." *Id.* In *Mathews*, the court applied this rationale for waiver because respondent raised the colorable argument "that because of his physical condition and dependency upon disability benefits, an erroneous termination would damage him in a way not recompensable through retroactive payments." *Id.* at 331.

Here, retroactive relief is not sufficient for TLC and its patient community -- in spades. The benefits of TLC's services that some current or potential patients will continue to lose because of the unlawful limitations here challenged can never be recovered. TLC's three county area is designated "medically underserved". TLC's Section 330 grant was made to provide services because members of the affected communities would otherwise not receive the services TLC provides. It is therefore certain that some substantial number of persons who are or would be TLC patients will not receive services they would receive were Medicare to pay TLC more than it currently does. Those patients' interests in having this issue "resolved promptly is so

great that deference to the agency's judgment is inappropriate." *Id.* at 330.[5]  As such, a waiver

of the requirement to exhaust administrative remedies is entirely fitting.  *Id.*

October 19, 2007                                    Respectfully submitted,


                                                   /s/ James L. Feldesman
                                                   James L. Feldesman (D.C. Bar No. 023796)
                                                   Kathy S. Ghiladi (D.C. Bar No. 435484)
                                                   Feldesman Tucker Leifer Fidell LLP
                                                   2001 L Street, N.W., Second Floor
                                                   Washington, D.C.  20036
                                                   (202) 466-8960 (telephone)
                                                   (202) 293-8103 (facsimile)

                                                   *Attorneys for Plaintiffs*

---

[5] There is also an issue of statutory rights to TLC's services.  Those rights in the end are available only to the extent TLC's finances permit.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THREE LOWER COUNTIES COMMUNITY HEALTH SERVICES, INC. 12137 Elm Street Princess Anne, Maryland 21853 | ) ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) Case No. 07-00844 ) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES 200 Independence Avenue, S.W. Washington, D.C. 20201 | ) ) ) ) ) |
| and | ) ) |
| MICHAEL LEAVITT, SECRETARY U.S. Department of Health and Human Services 200 Independence Avenue, S.W. Washington, D.C. 20201 | ) ) ) ) ) |
| *Defendants.* | ) |

**DECLARATION OF LAWRENCE R. POOLE**

I, Lawrence R. Poole, hereby depose and say that:

**EXPERIENCE**

1.      A resume reflecting my experience is attached to this declaration.  My experience with respect to the health center grant program authorized under Section 330 of the Public Health Service Act occurred largely (but not exclusively) during my employment in the national office of the Department of Health and Human Services' ("HHS") Health Resources and Services Administration ("HRSA").  That national office experience began in 1995 and ended in 2005 (when I retired from government service).

During that ten year period, each office I was a part of, or headed, had direct responsibility for approving and signing all the Section 330 grants that were then being made.

2.      Regarding this Declaration, unless otherwise indicated, I use my employment during that 10 year period as an important frame of reference for the statements made.  These statements also reflect what is taking place now.  Work that I now perform requires me to keep up with the processes and procedures currently being utilized by officials in my former office[1] and other HRSA officials who are also involved in the activities described below.  Finally, the statements also cover the processes and procedures utilized before my arrival in Washington.  Although responsible offices and certain unsubstantive details (*e.g.*, forms) have changed over time, I know from my experience preceding and during the above-described 10 year period that the regime of approval, oversight, audit and re-application described below existed in 1989 and 1990, when the Medicaid (1989) and Medicare (1990) FQHC programs were first enacted.

## GMO FUNCTION

3.      Offices to which I was assigned in that 10 year period principally performed a "Grants Management Officer" ("GMO") function.  The GMO function is similar in nature to the function of a "Contracting Officer", who oversees the business end of contracts awarded by the federal government to private parties.  In particular, in those offices, only a GMO is authorized to sign a grant award and commit the government to that award.  More than that, that GMO is responsible for all business

---

[1] By the time I left government service, the Grants Management Officer or Office function described below was, for HRSA, consolidated into a single HRSA office. Previously, bureaus within HRSA had performed that function.

matters relating to the grant.  When I say business matters, I mean grant budgets, grantee

compliance with various accounting and cost principles governing grantee expenditures,

following up on audit reports of grantees where auditors have raised questions regarding

the legitimacy of costs grantees have charged to federal awards, and taking enforcement

action against grantees that are failing to comply with grant conditions, irrespective of

whether those conditions relate to budgetary or expense matters or to programmatic

compliance.

### COMPREHENSIVENESS OF SECTION 330 PROGRAM

4.    Regarding the Section 330 Public Health Service Act grant program, to

receive a Section 330 grant award, an applicant must file budgetary and programmatic

documents explaining how the grant will be conducted, why the grant is needed for the

particular community or communities being served and detailing how the grant funds and

other revenues it is likely to receive will be spent.  As to such spending detail, the grantee

is required to complete various forms that show reviewing federal officials the amount of

money that will be spent on staff, including specific salaries of staff and fringe benefits,

as well as a "break-out" of all other expense items.  Based on this detail, both my former

office and programmatic officials responsible for the Section 330 program assess whether

the grantee's staffing patterns, especially the number of health professionals who will

provide services, are appropriate to the needs of the population the grantee would serve.

That same collection of officials also assesses whether the salaries being paid to all staff

are "reasonable" and whether other staffing (*i.e.,* other than professionals who see

patients) is appropriate to the circumstances within which the grantee will manage the

Section 330 grant project.  Their assessment also takes account of the other grantee costs

presented in the foregoing budgetary information.  All of these assessments are concerned (among other things) with whether the costs presented in the grantee's proposed budget are "reasonable".

5.      Based on the foregoing assessments, typically with some negotiation between grant applicants and programmatic officials or persons within my office, grant budgets are finally approved, but only after changes these officials deem necessary to comport with their judgments as to whether the costs being approved are "reasonable".

6.      The plans and budgets grantees submitted for review by programmatic and Grants Office officials of HRSA are comprehensive in nature.  By this, I mean that the program being described in the Section 330 grant application documents is not just the program that would be supported by Section 330 grant funds, but rather the grantee's entire program regardless of who will pay the costs.  Thus, the budgets and programmatic plans submitted for approval describe and/or reflect the totality of the Section 330 health centers' activities in the coming grant year.[2]

7.      In this regard, the Section 330 law requires grantees to enter into appropriate contract relationships to secure both Medicare and Medicaid support for those patients who are covered by those two federal programs.  Similarly, grantees are to take advantage to the extent they can of other State or local health programs that do or could provide coverage to the grantee's patients.  When grantees submit Section 330 grant budgets for approval, they describe, and detail, the amount of funding they expect to receive from such other sources.  The Section 330 award is based on what the grantee needs to pay for costs the grantee will incur for all activities in the coming year that will

_____

[2] There are a few grantees that engage in undertakings that are outside of the Section 330 health center "project" for which Section 330 grant funds are available.

not be paid either by those other funding sources or the patients themselves.  As to patient payments, Section 330 grantees are required to bill their patients on a sliding fee scale, pursuant to which individual patients without insurance (or not covered by any available health care program), or only with partial insurance or other coverage, who cannot afford the costs of care, are charged either a token fee (if they can pay it) or nothing at all.  (It is commonplace, therefore, for Section 330 health centers to pay all or a substantial part of Medicare or Medicaid co-payments as well as the differences between what State or local programs may pay for services and what the costs of such services actually are.)

8.    My experience in explaining how the Section 330 program actually works is that many people not familiar with the program envision Section 330 funded health centers as being divided into various parts based on funding source -- *e.g.*, like a university school of medicine where projects supported by federal grants are often assigned discrete (from other medical school) staff who directly conduct the particular project.

9.    This is not how Section 330 health centers work.  Medicare and Medicaid program beneficiaries (and all other patients regardless of payor source) are simply patients of the center, who come to the center for care, report to a receptionist and are then seen by a center physician and/or other licensed professional, as appropriate -- the same procedure used in private physicians' offices.  A Section 330 center physician's or professional's patient may be a beneficiary of another federal program, a poor patient on a sliding fee or even someone who is privately insured.  Patients are seen by those professionals in turn.  No physicians or other licensed professionals (or any other staff) are separately designated for treating patients who are Medicare or Medicaid

beneficiaries.  No sector of a health center or type of equipment or any other resource is separately designated for Medicare or Medicaid.

10.    Accordingly, when (as described further below) HRSA staff overseeing Section 330 grants approve budgets, monitor grantee performance, review grantee audits or recover costs grantees have incurred that are unreasonable or otherwise unallowable, they are acting with respect to activities conducted and costs charged to HHS by those grantees for care to (among others) Medicare beneficiaries.  And when the Medicare program refuses to pay costs to Section 330 supported health centers (which under the Medicare and Medicaid programs are automatically Federally-qualified health centers or "FQHCs") because the costs exceed the Medicare per visit cost ceiling, the Medicare program will be refusing to pay costs that the Section 330 HRSA staff, through its budgeting, monitoring and independent auditing have determined are "reasonable".

## ADMINISTRATION OF THE SECTION 330 PROGRAM

11.    Once a Section 330 Public Health Service Act grant award is approved, federal funding ensues.  Except for grantees that have limits placed on them because of issues or problems of which federal officials are aware, grantees have the right to draw down grant funds in advance.  They also have flexibility to depart somewhat from their approved budgets where necessary to meet changed circumstances after the award is made.  In all instances, with all their project funds, Section 330 health centers must limit their expenditures to what governing accounting standards describe as "reasonable" costs.

12.    After the Section 330 award is made, grantees are closely monitored.  In addition to tracking draw-downs of grant funds, HRSA officials are in frequent contact with grantees over various programmatic and budgetary matters.  HRSA officials also

make monitoring visits to grantees to check on how grantees are meeting programmatic and budgetary requirements. These monitoring visits are supplemented by routine periodic oversight arranged by HRSA for Section 330 grantees and conducted by outside "experts" and "consultants", who used guides prepared by HRSA to evaluate grantee compliance with all grant requirements. Reports on such visits are made to HRSA officials, who follow up criticisms in those reports by requiring the particular grantee to take corrective action. (Sometimes these visits are not routine but arranged to investigate problems brought to HRSA's attention.)

13.     Perhaps even more importantly, at least for budget and accounting matters, all Section 330 grantees are audited each year by independent, certified public accounting firms <u>that</u> follow a standard audit regime authorized under both the Single Audit Act and Section 330 itself (which requires annual audits of all health center activities of all grantees). The auditors are required to check for compliance with applicable accounting procedures and standards (designed to ensure proper accountability to the federal government for all of the various funds grantees have received) as well as the reasonableness of the costs the grantees actually have incurred, regardless of the funding source the grantee may actually have charged for the cost. To ensure that there is no misunderstanding of the import of what I have just stated, this means that the above-described audits cover all expenditures of grant funds and "non-grant" funds (*e.g.*, those received from the Medicare or Medicaid program).

14.     Accordingly, where grantees have departed from their originally approved Section 330 grant budgets because of changing conditions, the auditors are there to make certain that any such departures remain limited to reasonable costs.

15.     Scrutiny of budgetary and accounting matters for Section 330 grantees does not end with the federal audit of the prior year's grant.  My former office reviews grantee audits raising concerns.  Where my former office agrees with those concerns, it follows up.  Specifically, after that office reviews audits and monitoring visits identifying questionable costs, it coordinates with program staff and consults with the grantee over such costs, and then determines whether a particular cost is one the government should pay.  Assuming the concern over the cost, or grouping of costs, is "reasonableness," and my former office decides the concern is correct and the cost/cost group is "unreasonable", my former office takes a disallowance of the cost and the grantee must either repay the amount disallowed (with non-federal funds) or agree to an adjustment of future payments out of the Section 330 grant to account for the improper expenditure or expenditures. (There is also an appeal process offered to the grantee to contest such cost disallowances. Few grantees pursue that process.)

16.     In issuing such cost disallowances and collecting amounts disallowed, my former office does not distinguish between grant and non-grant funding or expenses.  The reason is that HRSA views Section 330 grant funding as "last dollar" in character -- *i.e.*, Section 330 funding is awarded solely to pay for health center costs for which there are not enough non-grant funds or for costs another funding source does not "cover", and if HRSA staff had known at the point of grant award that the grantee would incur that unreasonable cost, the staff would then have reduced the grant by the amount of that cost.

17.     In addition to audits and following up on audit findings, HRSA officials responsible for the Section 330 program have at least one more chance to identify and take corrective action regarding the possibility that costs associated with grantee

departures from their grant budgets may be unreasonable. Because most Section 330

grantees continue to receive awards year-by-year, to the extent a Section 330 grantee has

departed from its prior year's budget and incurred unreasonable costs in the process, the

programmatic and grants management officials who review grant applications also would

review those departures because they would be shown in the new budgets the grantees

present when seeking their next year's Section 330 grant. Assuming, therefore, that for

some reason the auditors (or my former office) missed costs that were unreasonable, my

former office or other reviewing officials would be likely to catch it in that grantee's

application for a new Section 330 grant and make an appropriate adjustment at that time.

18.    Section 330 grantees are not in the habit of overcharging the federal

government or paying munificent salaries to staff or buying extraneous equipment or

doing other things that would raise concerns about whether federal funding is being

appropriately utilized. I say this because, for most grantees, their budgets are very close

to the line of what they can afford. Section 330 awards provide funding the grantees

need to sustain their care to poor, uninsured or underinsured patients. Those needs have

steadily increased over the past years for many reasons, including an expanding number

of persons who utilize the health centers' services. Section 330 funding, although

increasing as a result of annual appropriations, is more and more being disproportionately

taxed by increasing financial demands on the health centers. The result of this is that

grantees must be extremely careful about their expenses and cannot afford to divert funds

to questionable expenditures. There are, of course, exceptions, but the general profile of

Section 330 health centers is that they are not a segment of the health care industry that

does, or is likely to, engage in profligate spending.

19.     Apart from the circumstances that militate against Section 330 health center profligate spending, I strongly believe that HRSA's process of awarding, monitoring, auditing, following up and re-awarding Section 330 grants which, among other things, is designed to prevent Section 330 grantees from incurring other than reasonable costs, works very well in keeping costs within reasonable boundaries.  As such, I question why the Medicare program, which as I understand it, is required to pay Section 330 grantees reasonable costs for those grantees' treatment of Medicare patients, would think that any further limits on grantee costs (presumably to keep such costs "reasonable") would be needed.  At the very least, I would have expected that Medicare officials responsible for adding limits to costs HRSA officials have approved as reasonable would have added these limits only if they had first identified weaknesses in the HRSA oversight system that would, could or did lead to unreasonable costs being charged by Section 330 grantees, and had imposed such extra limits only as needed to correct for those weaknesses.  I do not believe that such an evaluative process was ever undertaken by the Medicare program.  Had it been, I would almost certainly have known about it.  I know of none.

20.     Furthermore, to the extent Medicare program officials believe, or believed, that HRSA's oversight system was flawed to the extent that a per visit cost limit was needed to ensure against the incurrence by Section 330 grantees of unreasonable costs, I would have expected them to bring those flaws to the attention of officials responsible for Section 330 health center programs as well as the Medicaid program (which from its statutory inception in 1989 through December 31, 2000 required 100 percent reasonable cost reimbursement to FQHCs).  I am not aware of this having been done with HRSA

officials and, once again, I would almost certainly have known about such an effort had one existed.

21.    As to Medicaid, my understanding (from third parties) is that the Medicaid program did not require the use of the Medicare per visit limitation (or the Medicare productivity screen) by State Medicaid agencies when the Medicaid law required reasonable cost reimbursement of FQHCs.  Indeed, as I understand it (again from third parties), the federal Medicaid program in the same time period paid a federal share to States that Medicaid officials knew would (in part) be used to reimburse FQHCs for costs that exceeded the Medicare per visit limit (and the productivity screen).

22.    In short, costs Medicare officials were and are disapproving through the per visit limit (and screen) were and are being paid by the Medicaid program (State and federal shares) (and under Section 330 grants).  Stated otherwise, the same costs that State Medicaid agencies (and HRSA officials) consider to be "reasonable," and therefore will reimburse are deemed by the Medicare program to be "unreasonable".  Someone or some program has to be wrong in such a situation.  I would submit that the far greater experience of HRSA in overseeing and understanding Section 330 grantees as well as the careful and thorough HRSA oversight of grantee conduct described above would suggest that HRSA's view of a Section 330 grantee's cost reasonableness is far more likely to be the correct one.

I hereby declare under penalty of perjury that all statements herein are true and correct.

Date: 8/7/2007                                     Lawrence R. Poole
                                                   Lawrence R. Poole